[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 18, 2001
THOMAS K. KAHN
CLERK

_____

Nos. 99-14391 & 99-14807

_____

BIA Nos. A73-228-388; A26-599-077

FEDAA AL NAJJAR,
MAZEN AL NAJJAR,

Petitioners,

versus

JOHN ASHCROFT, ATTORNEY GENERAL,
US DEPARTMENT OF JUSTICE, et al.,

Respondents.

_____

Petitions for Review of Orders
of the Board of Immigration Appeals

_____

**(July 18, 2001)**

Before ANDERSON, Chief Judge, CARNES and OAKES*, Circuit Judges.

_____
*Honorable James L. Oakes, U.S. Circuit Judge for the Second Circuit, sitting by designation.

ANDERSON, Chief Judge:

Mazen and Fedaa Al Najjar, a husband and wife in consolidated deportation proceedings, appeal decisions of the Board of Immigration Appeals ("BIA") upholding an immigration judge's ("IJ's") order of deportation which denied their petitions for asylum, withholding of removal, and suspension of deportation under sections 208(a), 243(h) and 244(a) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1158(a), 1253(h) and 1252(a) (1996).  Because we find the BIA's decisions to be supported by reasonable, substantial, and probative evidence on the record considered as a whole, we affirm and dismiss their petitions.  Due to the complex procedural background of this case and the number of challenges raised, we set out the following table of contents to assist the reader of this opinion:

**TABLE OF CONTENTS**

I.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.  Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
        1.  IJ Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.  The INS Detains Mazen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        3.  BIA Review of the Al Najjars' Deportation Orders . . . . . . . . . . . 12
        4.  Mazen's Habeas Corpus Proceedings . . . . . . . . . . . . . . . . . . . . . . 14

II. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    A.  Judicial Review After IIRIRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    B.  Judicial Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    C.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    D. Asylum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        1. Actual Political Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        2. Imputed Political Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
        3. Denial of Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    E. Withholding of Deportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    F. Asylum & Withholding Testing Countries . . . . . . . . . . . . . . . . . . . 55
    G. Suspension of Deportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    H. Motions to Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
        1. Judicial Review of a Motion to Reopen . . . . . . . . . . . . . . . . . . 75
        2. Heavy Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
        3. Prima Facie CAT Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

## I. BACKGROUND

### A. Factual Background

Mazen Abdel Abdulkarim Al Najjar ("Mazen") was born in 1957 in Gaza.

He lived in Palestine with his parents until his first birthday, when he and his

family moved to Saudi Arabia. Mazen remained in Saudi Arabia with his parents

and five siblings for thirteen years. When Mazen was fourteen, he moved to Egypt

where he completed high school and attended Cairo University, culminating in the

receipt of a bachelor's degree in Civil Engineering in 1979. From 1979 until

1981, Mazen worked and lived in the United Arab Emirates ("UAE") on a

temporary work visa.

Mazen first entered the United States in 1981 using a Palestinian refugee

travel document issued by the Egyptian government. He came to this country to

pursue a master's degree in Industrial Engineering at North Carolina Agricultural and Technical State University ("NCATSU") in Greensboro, North Carolina after obtaining authorization from the Immigration and Naturalization Service ("INS") to remain in the United States for the duration of his nonimmigrant graduate student status.

In 1984, after completing most of his thesis, but before graduation, Mazen left the United States to visit his parents in the UAE.[1]  After this trip, Mazen re-entered this country on December 8, 1984, and has not left the United States since then.  Upon re-entry, he completed the final draft of his thesis and graduated with a master's degree in Industrial Engineering from NCATSU in May 1985.

Thereafter, Mazen entered a Ph.D. program in Industrial Engineering at North Carolina State University where he remained for two semesters.  While at North Carolina State, he was accepted into the doctoral program at the University of South Florida ("USF") in Tampa.  Mazen transferred to USF in 1986 and began working on his Ph.D.  In the fall of 1993, he finished his dissertation and, in 1994, earned his Ph.D. in Industrial Engineering from USF.

On January 30, 1988, while working toward his Ph.D. at USF, Mazen

---

[1] Mazen's parents recently became lawful permanent residents of the United States.  They spend approximately one-half of the year in this country and the other half in the UAE.  Mazen's brother lives in the UAE and works there as a banker.  One of Mazen's sisters also resides in the UAE, with her husband and children.

4

married his cousin, Fedaa Abdulkarim Muhammed Shaladen Al Najjar, in Tampa, Florida. Fedaa entered the United States on January 22, 1988, just days before the wedding, at the age of twenty-three. She was lawfully admitted to the United States by the INS as a nonimmigrant visitor with authorization to remain for only one year. Like Mazen, Fedaa entered this country with a Palestinian refugee travel document issued by the Egyptian government.

Fedaa was born in Saudi Arabia in 1964 to Palestinian parents. She lived in Saudi Arabia with her parents, two brothers, and four sisters from her birth until her entry into the United States. While in Saudi Arabia, Fedaa attended King Saud University, and received a bachelor's degree in Pharmacy. Fedaa's father passed away in 1994, while she was living in the United States, but Fedaa's mother, four sisters, and at least one of her two brothers presently reside in Riyadh, Saudi Arabia.

Despite the fact that Fedaa was born in Saudi Arabia, she has never been eligible for Saudi citizenship because Saudi law grants citizenship solely based on Saudi ancestry. Fedaa is of Palestinian ancestry and therefore is not entitled to Saudi citizenship. Nonetheless, Fedaa obtained a Saudi re-entry visa, which remained valid if she returned to Saudi Arabia at least every six months. Fedaa failed to satisfy this condition while residing in the United States and,

consequentially, she no longer has a valid Saudi re-entry visa.

Mazen has lived in Tampa, Florida since 1986 when he began his studies at USF. Since Fedaa's entry into the United States in 1988, she has resided continuously in Tampa, Florida, as well. While living there, the Al Najjars had three daughters together. Each of the Al Najjars' three daughters is a lawful citizen of this country.

While living in Tampa, Fedaa and Mazen have been active in the Arab-American and Muslim communities. Mazen helped begin a mosque with the Islamic Community of Tampa, where he was elected president and served in a capacity similar to an Imam, for those of the Sunni Muslim faith. Fedaa has been active in various charitable events and programs sponsored by the mosque.

Through the mosque, Fedaa and Mazen also helped found a private Muslim school, offering kindergarten through junior high school classes. Over the years, Fedaa taught classes at the mosque's school and volunteered there in other capacities.

While attending USF, Mazen helped begin the World and Islam Studies Enterprise ("WISE"), a think-tank ostensibly committed to educating the public about Islamic issues through research, publishing, and seminars. To this end, WISE held conferences with roundtable discussions involving international Islamic

leaders and scholars of the Middle East. WISE also published various journals in Arabic, tackling issues which face Muslims today, as well as cataloging discussions from the organization's conferences.

### B. Procedural Background

On April 19, 1985, the INS initiated deportation proceedings against Mazen by issuing an Order to Show Cause ("OSC") under § 241(a)(9) of the INA, 8 U.S.C. § 1251(a)(9) (1984), for failing to maintain the conditions of his nonimmigrant status by willfully providing untruthful information to the INS.[2] The Service thereafter supplemented the OSC, charging that Mazen had not maintained the conditions of his nonimmigrant student status under the INA. The case was administratively closed on June 4, 1986, because Mazen failed to appear at the hearing. Two weeks later, on June 18, 1986, Mazen formally requested that the proceedings be reopened because he had not received notice of the hearing

---

[2] These proceedings were initiated because of allegations made by Mazen's first wife, Jan Fairbetter. Mazen met Jan in the fall of 1983 while they were both students in North Carolina. The couple married in January 1984. The following month, Mazen and Fairbetter went to the INS office in Charlotte, North Carolina to submit Mazen's application for adjustment of status. They did not have all the appropriate documentation that day, so they left. In April 1985, Fairbetter and Mazen went back to the INS office in Charlotte to attempt to submit the adjustment of status application again. While meeting with INS agents, Fairbetter informed the Service that her marriage to Mazen was a sham and that she had married him solely to allow him to obtain a green card. Fairbetter's allegations were the grounds for the 1985 OSC issued against Mazen. Mazen has consistently denied that the marriage was in any way fraudulent. However, Mazen does not argue that his marriage to Fairbetter should be helpful to him with respect to any issues before this court.

until two days after it was held. Mazen's motion to reopen went unanswered for almost ten years, until his 1985 deportation proceedings were recalendared for February 8, 1996.

In the meantime, Fedaa self-reported for deportation proceedings. On January 22, 1996, by OSC and Notice of Hearing, the INS charged Fedaa as deporatable under § 241(a)(1)(B) of the INA, 8 U.S.C. § 1251(a)(1)(B) (1996), as a nonimmigrant alien who remained in the United States for a longer period than permitted.

### 1. IJ Proceedings

On February 8, 1996, Mazen's recalendared deportation hearing was held. The Service issued a Form I-261 to supplement the factual allegations contained in the April 1985 OSC. Over the objection of the INS, the IJ granted the Al Najjars' motions to consolidate their deportation proceedings. Mazen and Fedaa both conceded deportability under the INA but requested relief from deportation in the form of asylum, withholding of removal, and suspension of deportation. In July and October of 1996, consolidated hearings before an IJ in Orlando, Florida took place.

At these hearings, Mazen and Fedaa argued that they were stateless Palestinians and declined to designate a country of deportation. Instead, the Al

8

Najjars argued that no Middle Eastern country would accept them as permanent residents due to their lack of citizenship anywhere in the world.

In the course of the proceedings before the IJ, testimony from witnesses was heard, and a voluminous amount of documentary evidence was adduced. While much of this evidence was relevant to proving the elements of the Al Najjars' petitions for relief, a substantial amount of evidence pertained to Mazen's professional associations while living in Tampa, Florida. With respect to this latter type of evidence, the INS produced various media accounts, documents seized from WISE's offices, and testimony of special agents with the Federal Bureau of Investigations ("FBI") and the INS. This evidence, primarily offered by the Service, purported to show an association between Mazen and individuals supporting terrorism in the Middle East. The INS argued that this terrorist evidence was offered to demonstrate that the Al Najjars were not worthy of any discretionary relief.

Much of the terrorist evidence offered to the IJ pertained to Mazen's and WISE's involvement with Ramadan Abdullah Shallah, a former adjunct professor at USF and an official of WISE, who left the United States in June of 1995. On October 31, 1995, at the funeral of assassinated Palestinian Islamic Jihad ("PIJ") founder and leader Fathi Shikaki, Shallah was allegedly proclaiming himself as the

9

new leader of the PIJ. During this speech, Shallah allegedly threatened to "eradicate" Israel, vowed to avenge Shikaki's assassination at the hands of Israeli operatives, and "applauded the assassination . . . of Prime Minister Yitzhak Rabin of Israel." Before the IJ, Mazen's attorney stipulated that Shallah had been reported to be the new leader of the PIJ.

The PIJ is on the Secretary of State's list of terrorist organizations. The group is committed to the creation of an Islamic Palestinian state and to undermining any attempt at a peaceful resolution of the Palestinian/Israeli conflict. The PIJ has taken responsibility for suicide bombings in the West Bank, Israel, and other parts of the Middle East that have killed Israeli soldiers, civilians, and an American student. In addition to the alleged association between WISE, the PIJ, and Shallah, many record documents purported to show a relationship between other militant organizations and WISE, as well as a Tampa-based charitable organization, the Islamic Concern Project ("ICP"), which was founded by Mazen's brother-in-law Sami Al Arian. To this end, FBI and INS agents testified before the IJ that WISE and ICP were used as fronts to raise money for the PIJ and other militant Islamic-Palestinian groups such as the Hamas and the Intifada.

On May 13, 1997, the IJ issued separate decisions in Fedaa's and Mazen's cases, denying all forms of relief, including asylum, suspension of deportation, and

withholding of removal. The IJ designated the UAE as the appropriate country of deportation for Mazen, and Saudi Arabia as the appropriate country of deportation for Fedaa. The Al Najjars immediately appealed both decisions to the BIA.

## 2. The INS Detains Mazen

On May 19, 1997, days after the IJ issued its decisions in the Al Najjars' deportation proceedings, Special Agents with the FBI and INS arrested Mazen at his home based upon classified information that Mazen was connected with Middle Eastern terrorist organizations. On the basis of this secret evidence, the INS held Mazen without bond on the ground that he posed a threat to national security.

Mazen requested a redetermination of his custody status in the immigration courts pursuant to 8 C.F.R. § 242.2(d) (1995). The INS responded by serving him with a notice of intent to present classified information in an in camera proceeding in support of its custody determination. On May 29, 1997, a bond redetermination hearing was held before an IJ who conducted an ex parte in camera review of classified information submitted by the Service to prove Mazen's association with the PIJ and other terrorist groups. Neither Mazen nor his attorney was present at this hearing, and no record of the hearing was made. The IJ did provide Mazen with an unclassified summary of the classified information, stating that: "This Court was provided with information as to the association of [Mazen] with the

11

Palestinian Islamic Jihad."   Thereafter, the IJ issued a written decision finding that the classified information demonstrated that Mazen was a threat to national security which justified the INS's decision to hold him in custody without bond.

Mazen appealed the IJ's decision to the BIA on the ground that it violated his First and Fifth Amendment rights to be held without bond on the basis of classified information.  On September 15, 1998, the BIA issued its decision, finding that "in view of the government's compelling need to shield important, classified national security information bearing on this matter, the Immigration Judge's examination of the ex parte evidence in camera was proper and constitutionally sound." Further, the BIA noted that the record reflected that Mazen was "associated" with the PIJ, and that his release from custody "would pose a threat to both (1) the national security of this country . . . and (2) the safety of other persons or property . . ." Thus, the BIA affirmed the IJ's decision denying Mazen's request to be released on  bond.

### 3.  BIA Review of the Al Najjars' Deportation Orders

In October 1999, over two years after the IJ entered the Al Najjars' deportation orders, and almost one year after the BIA affirmed the continued detainment of Mazen on the basis of classified evidence, the BIA entered separate written decisions affirming the IJ's denial of relief to Mazen and Fedaa.  See In re

12

Mazen Al Najjar, No. A26 599 077—Miami, at 3 (BIA Oct. 26, 1999) (unpublished); In re Fedaa Al Najjar, No. A73 228 388 – Orlando, at 2 (BIA October 4, 1999) (unpublished). After denying the Al Najjars' requests for oral argument, the BIA upheld the IJ's orders of deportation and dismissed Fedaa's and Mazen's appeals.

In both cases, the BIA found that "the Immigration Judge adequately considered all of the evidence presented below under the proper legal standards and correctly addressed the issues that respondent[s] . . . raised on appeal." First, the BIA affirmed the IJ's pretermittance of Mazen's suspension application and the IJ's denial of Fedaa's suspension petition on the ground that she failed to demonstrate extreme hardship. Next, the Board affirmed the IJ's finding that the Al Najjars failed to demonstrate a "well-founded fear of persecution" sufficient to support an asylum claim. Third, the BIA affirmed the IJ's conclusion that, because they could not demonstrate statutory asylum eligibility, they could not meet the "higher burden" required to demonstrate entitlement to withholding of deportation. Accordingly, for the reasons set forth in the IJ's decision, the BIA affirmed the denial of affirmative relief to the Al Najjars.

The BIA then denied both of the Al Najjars' motions to remand. As to their joint motion to remand under the Convention Against Torture ("CAT"), the BIA

13

held that, because the "respondent[s] failed to establish a well-founded fear of persecution" sufficient to support an asylum claim, they could not "meet the higher standard of presenting a prima facie case" under CAT. Secondly, the BIA denied the motions to remand for a new hearing on Mazen's suspension claim, "given [its] disposition of th[e] appeal." The Al Najjars filed a direct appeal of these decisions with this court.

### 4. Mazen's Habeas Corpus Proceedings

During the pendency of the Al Najjars' appeal to this court, Mazen filed a verified petition for habeas corpus and a complaint for declaratory and injunctive relief in the district court for the Southern District of Florida on December 22, 1999.[3] See Al Najjar v. Reno, 97 F. Supp. 2d 1329 (S.D. Fla. 2000). In this petition, Mazen sought immediate release from custody pending the outcome of his deportation proceedings. He argued that his detention was unconstitutional and not authorized under any applicable regulations or statutes. The INS responded by filing a notice of intent to present to the district court the classified information that had previously been provided to the IJ and BIA in the custody proceedings.

---

[3] By discussing the district court decision in Mazen's habeas corpus proceedings, we do not mean to imply any view on any issue decided by that court in that proceeding, nor do we adopt any of that court's reasoning or discussion. Indeed, presently pending before us in a wholly separate appeal is the propriety of the district court's decision in Mazen's custody proceedings. See Al Najjar v. Ashcroft, No. 00-14947 (11th Cir. filed Sept. 18, 2000).

In an Order issued May 31, 2000, the district court found that the use of classified information at a bond redetermination proceeding "was within the implied statutory authority granted by INA § 242(a) and 8 C.F.R. § 3.19(d)." Id. at 1349. Nonetheless, the court held that, by using the classified information against Mazen, the INS violated his rights to procedural due process. See id. at 1356-57. To remedy this, the district court granted relief, which had the effect of setting aside the the immigration court's bond determination so that a decision comporting with due process could be entered. The court warned that, in order to respect Mazen's due process rights upon rehearing, the immigration courts must rely exclusively on a public record or implement certain procedural safeguards to protect Mazen's rights despite the use of secret evidence. See id. at 1357-60.

Lastly, the district court examined Mazen's claim that his First Amendment associational rights were violated through the use of evidence purporting to criminalize an "association" with terrorist sympathizers. The court concluded that Mazen's "mere 'association' with the PIJ is not a reasonable foundation for the IJ's decision to deny bond and continue to detain Petitioner as a threat to national security." Id. at 1362. Thus, on remand, the court instructed the IJ to "determine whether the evidence demonstrates more than mere 'membership' or 'association,' but rather a 'meaningful association' or a 'degree of participation' in activities

15

posing a threat to national security." Id. Based on the foregoing, the court denied Mazen's petition for habeas corpus in part by refusing to release him from custody, and granted the petition in part by effectively setting aside, as unconstitutional under the circumstances, the immigration court's decisions to hold him without bond. In resolving the case, the court expressly found that review of the classified information was "unnecessary," and noted that it did not review the information in resolving Mazen's habeas corpus petition. Id. at 1336.

Upon redetermination, the immigration judge held a two-phase proceeding in accordance with the district court's opinion. First, the IJ examined the public record evidence and found that "the public record is insufficient to conclude that [Mazen] must be detained as a national security threat." The IJ then explained that, if the Service so moved, it would conduct phase-two of the proceedings in which the INS could offer classified evidence in accordance with procedures that would protect Mazen's constitutional rights.

The INS filed such a motion and on November 29, 2000, the IJ entered a second order finding that the unclassified summary of the classified evidence submitted by the Service "fails to provide Respondent with 'notice of the evidence against him and a meaningful opportunity to defend against that evidence.'" Thus,

the IJ concluded that Mazen was eligible to be released on bond.   The INS appealed.

On appeal, the BIA denied the INS's request to stay the November 29th Order releasing Mazen on bond.  On December 15, 2000, after being detained for three and one-half years without any formal criminal charges being lodged, Mazen was released from custody on bond to await the resolution of his and his wife's deportation proceedings.

## II.  ANALYSIS

In appealing their deportation orders, the Al Najjars raise a myriad of issues. While we have considered all of the Al Najjars' arguments, we discuss only those issues which merit analysis.  Before doing so, however, we will examine our own jurisdiction.

### A.  <u>Judicial Review After IIRIRA</u>

Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, as amended by Extension of Stay in United States for Nurses Act, Pub. L. No. 104-302, 110 Stat. 3656 (1996), our authority to review a final order of deportation was altered from the previous grant under section 106 of the INA, 8 U.S.C. § 1105a (1995).  <u>See</u> <u>Anin v. Reno</u>, 188 F.3d 1273, 1275-76 n.2. (11th Cir. 1999) (per curiam).

17

Specifically, IIRIRA § 306(b) repealed INA § 106, formerly 8 U.S.C. § 1105a, and IIRIRA § 306(a) replaced it with INA § 242, now codified at 8 U.S.C. § 1252 (1999). See id.

Where a final order of deportation is entered more than thirty days after the September 30, 1996, enactment of IIRIRA, and the deportation proceedings were begun before April 1, 1997, the proceedings are not subject to the permanent new rules at INA § 242, 8 U.S.C. § 1252 (1999). See IIRIRA §§ 309(c)(1) & (4), reprinted in 8 U.S.C. § 1101 (history) (1999). Instead, IIRIRA's "transitional changes in judicial review" ("transitional rules") govern such a case. See id.

Mazen's deportation proceedings commenced in 1985 when the INS issued an OSC against him. Fedaa's proceedings began in January of 1996 with the issuance of an OSC as well. Final orders of deportation were entered against Mazen and Fedaa in October 1999 when the BIA, by written opinion, affirmed the IJ's decision denying relief under the INA. See 8 C.F.R. § 241.31 (2001) (explaining that an order of deportation "shall become final upon dismissal of an appeal by the Board of Immigration Appeals," among other things). Thus, the Al Najjars are subject to the transitional rules, not the new "permanent rules." See Anin, 188 F.3d at 1276 n.2.

"Under the transitional rules, the 'new rules' do not apply unless a case meets the enumerated exceptions in IIRIRA § 309(c)(4)." See id. That is, under the transitional rules, the old rules apply unless any of the transitional rules is triggered. See IIRIRA § 309(c)(1). Thus, as long as IIRIRA § 309(c) does not expressly alter our § 1105a review, we shall be guided by this old rule in reviewing a transitional alien's petition.[4] See id.

## B. Judicial Notice

Before delving into the fact-intensive issues in this appeal, we will address the Al Najjars' two motions to supplement the record and requests for judicial

---

[4] While the general rule is that none of the new, permanent rules codified at 8 U.S.C. § 1252 (1999), apply to transitional aliens, there is one exception articulated in IIRIRA § 306(c)(1) and made applicable to transitional aliens through IIRIRA § 309(a). See IIRIRA §§ 309(a) and 306(c)(1), reprinted in 8 U.S.C. §§ 1101 & 1252 (history). Section 306(c)(1) of IIRIRA directs that the new, permanent rule in 8 U.S.C. § 1252(g) (1999), shall apply "without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings." See IIRIRA § 306(c)(1). In turn, § 1252(g) states that "[e]xcept as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." 8 U.S.C. § 1252(g) (1999).

In Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 487, 119 S. Ct. 936 (1999), the Supreme Court explained that § 1252(g)'s jurisdictional bar applies only to a limited subset of deportation claims by precluding judicial review of the Attorney General's discrete acts of "commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders." Id. at 482, 119 S. Ct. at 943. Construing § 1252(g) narrowly, the court reasoned that subsection (g) "performs the function of categorically excluding from non-final-order judicial review – even as to transitional cases otherwise governed by § 1105a . . . – certain specified decisions and actions of the INS." Id. at 483, 119 S. Ct. at 943 (emphasis added). Because the Al Najjars are transitional aliens petitioning the court of appeals for judicial review of the BIA's final orders of deportation, § 1252(g) does not alter our review.

19

notice. This is necessary in order to paint the factual backdrop against which we review their petitions.

We summarily denied the Al Najjars' first motion to supplement through a single judge Order dated May 19, 2000. On August 14, 2000, the Al Najjars filed a second motion to supplement, which is essentially a renewal of the first, containing the same documents submitted with the first motion, plus five additional documents. Specifically, the second motion seeks to add twenty-one documents to the record, containing information which spans the gamut from newspaper clippings pertaining to Mazen's detainment, to letters from the Embassy of the UAE and Amnesty International reports on human rights in Israel. The Al Najjars argue that if we refuse to supplement the record with this evidence, we should take judicial notice of the facts contained in at least some of these documents, as the facts asserted therein meet the criteria for judicial notice under the Federal Rules of Evidence.

The Al Najjars also included a request for judicial notice in their reply brief on appeal, seeking recognition of United States treaties with Israel, Saudi Arabia, Egypt, and the UAE. The Al Najjars argue that these treaties require the sharing of classified information and that the United States, in consideration of its own notion

that Mazen is a threat to national security, must apprise these nations of its concerns.

The record reveals that the Al Najjars did not move the BIA for administrative notice, nor did the Al Najjars seek to supplement the record before the Board with any of the foregoing documents. After examining our authority to admit factual material in the first instance in an immigration appeal, we address each of these motions in turn.

Under § 106(a)(4) of the INA, 8 U.S.C. § 1105a(a)(4) (repealed), an alien's "petition shall be determined solely upon the administrative record upon which the deportation order is based."[5] Indeed, the "general rule, applicable across the board to judicial review of administrative action and merely codified for immigration appeals in section 1105a(a)(4), is that the court may not go outside the administrative record." Osaghae v. U.S. INS, 942 F.2d 1160, 1162 (7th Cir. 1991).

It is axiomatic that immigration courts are better suited than a reviewing court to make factual determinations regarding an alien's status. Courts of appeal sit as reviewing bodies to engage in highly deferential review of BIA and IJ

---

[5] This old rule was repealed by IIRIRA but is applicable to transitional aliens through incorporation. See IIRIRA §§ 309(c)(1) and (4).

determinations.  See INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S. Ct. 1439, 1445 (1999) ("judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations'"); INS v. Elias Zacarias, 502 U.S. 478, 112 S. Ct. 812 (1992) (establishing a deferential substantial evidence test for our review of the BIA's factual findings); Mitev v. INS, 67 F.3d 1325, 1331 (7th Cir. 1995) (Because of the "'extremely fact-intensive nature of [deportation] inquiries' and the superior expertise of the agencies that administer our immigration law," reviewing courts are "limited to providing deferential review of BIA decisions.").  Commensurate with this role, we cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below.  See Mazariegos v. INS, 241 F.3d 1320, 1323 (11th Cir. 2001) (We "have emphasized [that] we may not 're-weigh the evidence' from scratch."); Rivera-Cruz v. INS, 948 F.2d 962, 967 (5th Cir. 1991) (the alien's attempt to argue "facts for the first time in this forum is misplaced, for we cannot weigh evidence that has not been brought previously before the Board"); Tejeda-Mata v. INS, 626 F.2d 721, 726 (9th Cir. 1980) ("it is an established principle that this court does not sit as an administrative agency for the purpose of fact-finding in the first instance."); see also Pollgreen v. Morris, 770 F.2d 1536, 1544-45 (11th Cir. 1985) (reversing

22

the district court's <u>de novo</u> review of factual evidence which the administrative body had not previously considered because "[o]ur review . . . is limited to the record compiled before the agency.").

Before IIRIRA, however, this Circuit and many others utilized 28 U.S.C. § 2347(c) to invoke our discretionary authority to remand immigration cases in which § 1105a(a)(4) applied, so that new, non-record evidence could be admitted on appeal and remanded for consideration by the Board.  <u>See, e.g.,</u> <u>Sayid v. INS</u>, 132 F.3d 1380, 1384-85 (11th Cir. 1998) (considering whether remand for the consideration of new evidence admitted for the first time on appeal was warranted under § 2347); <u>Osaghae</u>, 942 F.2d at 1161-62; <u>Makonnen v. INS</u>, 44 F.3d 1378, 1384-86 (8th Cir. 1995); <u>Becerra-Jimenez v. INS</u>, 829 F.2d 996, 1000-1002 (10th Cir. 1987); <u>Bernal-Garcia v. INS</u>, 852 F.2d 144, 147 (5th Cir. 1988); <u>Dolores v. INS.</u>, 772 F.2d 223, 226-27 (6th Cir. 1985) (per curiam); <u>Coriolan v. INS</u>, 559 F.2d 993, 1002-04 (5th Cir. 1977) (taking judicial notice of non-record Amnesty International report to find that the report established dramatic changes in country conditions which merited reversal and remand under § 2347(c) for further consideration of the alien's asylum claim).[6]  <u>But see</u> <u>Ramirez-Gonzalez v. INS</u>, 695

---

[6] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

23

F.2d 1208, 1213-14 (9th Cir. 1983) (holding that it is improper to apply § 2347(c) where an asylum applicant presents new evidence for the first time on appeal, because remanding under § 2347(c) amounts to an order to reopen, and a court should not generally compel the INS to reopen proceedings).

In transitional cases, however, IIRIRA § 309(c)(4)(B) directs that "a court may not order the taking of additional evidence under section 2347(c) of title 28." See Altawil v. INS, 179 F.3d 791, 792-93 (9th Cir. 1999) (denying transitional alien's request for leave to adduce additional evidence and to remand to the Board thereon since IIRIRA § 309(c)(4)(B) precludes the reviewing court from "order[ing] the taking of additional evidence by the Board under 28 U.S.C. 2347(c)"). Section 2347(c) pertains to an application in the court of appeals "for leave to adduce additional evidence" that "is material" and for which "there were reasonable grounds for failure to adduce the evidence before the agency." 28 U.S.C. § 2347(c) (1994). Thus, IIRIRA's prohibition of remanding for the consideration of "additional evidence" pertains to non-record evidence that is introduced in the first instance before a reviewing court. See Cardenas-Uriarte v. INS, 227 F.3d 1132, 1138 (9th Cir. 2000) ("Section 2347 concerns a party's appeal to [this] court [asking permission] to adduce additional evidence, for example, where new evidence about a well-founded fear of persecution is discovered.").

24

This court has not yet examined how § 1105a(a)(4) and § 2347(c) function in cases in which IIRIRA § 309(c)(4)(B) applies.  Thus, we have surveyed the landscape of decisions granting judicial notice in immigration cases.

In an en banc decision, the Ninth Circuit reasoned that § 1105a(a)(4) permits a court of appeals to "review out-of-record evidence only where (1) the Board considers the evidence; or (2) the Board abuses its discretion by failing to consider such evidence upon the motion of an applicant."[7]  Fisher v. INS, 79 F.3d 955, 964 (9th Cir. 1996).  Based on this rule, Fisher refused to notice State Department Country Reports that could have been, but were not, offered below.  See id. at 964.  In later decisions, the Ninth Circuit retreated from Fisher.  See, e.g., Lising v. INS, 124 F.3d 996, 998-99 (9th Cir. 1997) (taking judicial notice of official INS forms not contained in the administrative record); Gafoor v. INS, 231 F.3d 645, 655-56 (9th Cir. 2000) (taking judicial notice of dramatic developments in the proposed country of deportation arising between the BIA's decision and appellate review).  But see Hernandez v. INS, 229 F.3d 1157 (table), 2000 WL 831811, *1 (9th Cir. 2000) (unpublished mem.) (denying alien's request to file supplemental brief under

[7] The court deemed Fisher's rule so pervasive that it overruled all prior inconsistent decisions, explaining that "[t]o the extent our prior decisions may be interpreted as authorizing us to take judicial notice of information not part of the administrative record or not previously submitted to the Board, they are overruled as inconsistent with the Act and prior precedent."  Id. at 963.

Fisher because the brief "seeks, not to make legal arguments, but rather to present new evidence to this court"); Lin v. INS, 216 F.3d 1083 (table), 2000 WL 519092, at *1 (9th Cir. 2000) (unpublished mem.) (refusing, under Fisher, to consider an affidavit which was not part of the administrative record but was submitted for the first time with the alien's appellate brief); Orlando Villalobo v. INS, 173 F.3d 861 (table), 1999 WL 170865, *1 n.5 (9th Cir. 1999) (unpublished mem.) (refusing, under Fisher, to consider Department of State Report that was not part of the administrative record); Fonseca-Zamora v. INS, 122 F.3d 1070 (table), 1997 WL 559637, at *1 n.2 (9th Cir. 1997) (unpublished mem.) (denying request for judicial notice of non-record Department of State Country Reports under Fisher).

In Lising v. INS, the Ninth Circuit attempted to justify the expansion of Fisher, by delineating Fisher's policy and scope. See 124 F.3d at 998. Lising explains that: (1) "Fisher relates to evidentiary material that either party could have presented to the BIA but that the petitioner simply failed to introduce at the hearing" and, (2) "[t]he Fisher rule was intended to ensure that the petitioners present all outside documents, reports, or information during the course of the administrative proceedings and not offer them for the first time before th[e reviewing] court." Id. Based on this articulation of Fisher, the Ninth Circuit has taken judicial notice of INS forms not contained in the administrative record, see

26

id., as well as dramatic developments in the proposed country of deportation which arose between the BIA's decision and the court of appeals review, see Gafoor, 231 F.3d at 655-56.

"The Sixth Circuit consistently takes judicial notice of changed political circumstances in immigration cases." Ivezaj v. INS, 84 F.3d 215, 219 (6th Cir. 1996) (citing cases). To justify this in jurisdictional terms, the court has concluded that § 1105a(a)(4) "cannot be interpreted to bar [a court of appeals] . . . from taking judicial notice of changed conditions in a foreign country." Id. at 218.

Similarly, without comment as to § 1105a(a)(4) or § 2347(c), the Seventh Circuit has taken judicial notice of drastic changes in country conditions occurring in the interim between the BIA decision and the court of appeals review. See Kaczmarczyk v. INS, 933 F.2d 588, 594 n.4 (7th Cir. 1991); Dobrota v. INS, 195 F.3d 970, 973 (7th Cir. 1999) (judicially noticing a State Department Country Report and examining the facts therein which impacted the alien's asylum claim, without mention of § 1105a(a)(4)); see also Fornalik v. Perryman, 223 F.3d 523, 529 (7th Cir. 2000) (taking judicial notice of official notice sent by INS to alien even though it was not contained in the administrative record). More recently, in Meghani v. INS, 236 F.3d 843, 847-48 (7th Cir. 2001), the Seventh Circuit, however, refused to remand an alien's case so that a more current Department of

State Report could be considered, even though the report was issued after the

BIA's decision but before judicial review. Although <u>Meghani</u> was a transitional

rule case, its impetus for refusing to remand was not § 1105a(a)(4) or IIRIRA §

309(c)(4)(B). Instead, <u>Meghani</u> was based on the Seventh Circuit's recognition

that the alien could file a motion to reopen. <u>See id.</u> at 848.

 The common factor emerging from these decisions granting judicial notice is

that virtually all recognize only facts relating to dramatic changes of conditions in

the proposed country of removal which arose after the BIA's review.[8] <u>See, e.g.</u>,

---

[8] In the asylum context, Congress permits the Attorney General to consider changed circumstances that materially affect an applicant's petition. <u>See</u> 8 U.S.C. § 1158(a)(2)(D) (1999). Indeed, under § 208(a)(2)(D) of the INA, 8 U.S.C. § 1158(a)(2)(D), successive asylum petitions may be considered "if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the [time] period." INA regulations identify two types of "changed circumstances" sufficient to trigger § 1158(a)(2)(D): 1) Material changes of conditions in the removal country; or 2) Objective and material changes relating to an applicant in the United States. <u>See</u> 8 C.F.R. § 208.4(a)(4) (2001) (defining "'changed circumstances' in section 208(a)(2)(D) of the Act" as including, but not being limited to: 1) "[c]hanges in conditions in the applicant's country of nationality or, if the person is stateless, country of last habitual residence," or 2) "[c]hanges in objective circumstances relating to the applicant in the United States.").

 The Al Najjars argue that the new evidence presented in their motions to supplement pertains to objective changes in circumstances which arose in the United States. Thus, the Al Najjars contend that under the statute, as interpreted by the C.F.R., we may judicially notice such facts. We disagree.

 While § 1158(a)(2)(D) permits the consideration of changed circumstances, it does not authorize a reviewing court to assess these new factual allegations. Instead, § 1158(a)(2)(D) vests the Attorney General with the power to judge an alien's changed circumstances petition by requiring the alien to demonstrate "changed circumstances" to the "satisfaction of the Attorney General," not the courts. <u>See</u> 8 U.S.C. § 1158(a)(2)(D). While we recognize that the C.F.R. definition of "changed circumstances" includes the factual scenario they allege – changes in objective circumstances relating to the applicant in the United States – we glean no authority from § 1158(a)(2) for this court to consider such circumstances in the first instance. Therefore,

Gafoor, 231 F.3d at 655-56; Dobrota, 195 F.3d at 973; Ivezaj, 84 F.3d at 218-19; Kaczmarczyk, 933 F.2d at 594 n.4; see also Fornalik, 223 F.3d at 529 (noticing official INS form); Lising, 124 F.3d at 998 (same). We derive little comfort from the surveyed decisions, however, because none justifies how, in the face of IIRIRA § 309(c)(4)(B), we may expand the administrative record with facts not adduced below. Some of the surveyed decisions are governed by the old rules, and therefore do not reflect the effect of IIRIRA § 309(c)(4)(B). Of those cases that do fall under the transitional rules, none even mentions IIRIRA § 309(c)(4)(B), and therefore, we cannot regard them as persuasive authority.

We interpret IIRIRA § 309(c)(4)(B) as eliminating our authority under § 2347(c) to remand to the BIA so that an alien can present "additional evidence." See IIIRIRA § 309(c)(4)(B); Sayid, 132 F.3d at 1384 n.5 (noting, in dicta, that IIRIRA "eliminates § 2347 jurisdiction over motions to reopen"). This means that, in transitional cases, IIRIRA prohibits us from ordering the BIA to consider evidence that is offered for the first time on appeal, even if such material satisfies the rigors of § 2347(c). Under transitional rule § 309(c)(4)(B), we must act within the constructs of § 1105a(a)(4) and may not rely on our § 2347(c) authority. Given

we reject the Al Najjars' argument that § 1158(a)(2)(D) somehow authorizes us to consider new evidence relating to their asylum petitions, and return to our jurisdictional inquiry.

29

this procedural paradigm, IIRIRA § 309(c)(4)(B) is a jurisdictional bar that precludes our consideration of non-record evidence submitted for the first time on appeal.[9] Having satisfied ourselves of this rule, we turn now to address the Al Najjars' two motions to supplement the record on appeal and to take judicial notice.

The Al Najjars' second motion to supplement and/or to take judicial notice is nothing more than an attempt to have us weigh non-record evidence for the first time on appeal and to remand for the consideration of this additional evidence. Under § 1105a(a)(4), however, we cannot consider evidence that was not previously brought before the Board.[10] See Onyeme v. INS, 146 F.3d 227, 235 n.8 (4th Cir. 1998). Our role as a reviewing body does not contemplate a fact-finding function, and § 1105a(a)(4) stands to prohibit us from such an endeavor in the usual case by limiting our review to the administrative record.[11] Even if we were

_____

[9] The Al Najjars do not argue that the BIA or IJ unconstitutionally excluded this supplemental evidence. Therefore, we express no opinion whether § 1105a(a)(4) or IIRIRA § 309(c)(4)(B) would preclude consideration of non-record evidence which was unconstitutionally excluded below. See, e.g., Ladha v. INS, 215 F.3d 889, 903-05 (9th Cir. 2000); Colmenar v. INS, 210 F.3d 967, 971-972 (9th Cir. 2000); Kuhai v. INS, 199 F.3d 909, 913-14 (7th Cir. 1999); Kossov v. INS, 132 F.3d 405, 408-09 (7th Cir. 1998).

[10] Our review of the documents leaves us doubtful that these submissions would help the Al Najjars anyway. None of the supplemental proffers establishes that the Al Najjars would be persecuted in either the UAE or Saudi Arabia.

[11] As explained in note 9, supra, we express no opinion whether § 1105a(a)(4) or § 309(c)(4)(B) would preclude consideration of non-record evidence which was unconstitutionally excluded below.

inclined to disregard § 1105a(a)(4) under our § 2347(c) discretion, as some of our sister Circuits have done, IIRIRA § 309(c)(4)(B) has stripped us of authority to step outside of the administrative record and to remand for the consideration of non-record evidence. Pursuant to IIRIRA § 309(c)(4)(B) and § 1105a(a)(4), we deny the Al Najjars' second motion to supplement the record with new evidence relating to the merits of their petitions for relief.

Despite the jurisdictional bar to our consideration of the foregoing non-record documents, the Al Najjars' claim, on appeal, that Mazen's custody proceedings improperly affected their deportation cases.[12] Although we are

---

[12] One such plea was advanced for the first time at oral argument, when the Al Najjars argued that the BIA was improperly influenced by classified information presented in an in camera ex parte hearing before the IJ and BIA in Mazen's custody proceedings. We will not consider this argument made for the first time at oral argument. First, under 8 U.S.C. § 1105a(c) (1994) (repealed), which applies to transitional aliens through incorporation, see IIRIRA § 309(c); Lara v. Trominski, 216 F.3d 487, 491-92 (5th Cir. 2000) ("the transitional rules incorporate § 106(c), 8 U.S.C. § 1105a(c)"); Sofinet v. INS, 188 F.3d 703, 708 (7th Cir.1999) (same); Hose v. INS, 180 F.3d 992, 996 (9th Cir.1999) (en banc) (same), there shall be no review of a claim "if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." Richardson v. Reno, 162 F.3d 1338, 1373 (11th Cir. 1998) ("Richardson I"), vacated, 526 U.S. 1142, 119 S. Ct. 2016 (1999) (mem.), on remand, 180 F.3d 1311 (11th Cir. 1999) (Richardson II), cert. denied, 529 U.S. 1036, 120 S. Ct. 1529 (2000); Ka Fung Chan v. INS, 634 F.2d 248, 258 (5th Cir. 1981). The Al Najjars never raised the improper influence argument before the BIA, and their attempt to do so for the first time in this court is misplaced. See 8 U.S.C. § 1105a(c).

The Al Najjars also failed to raise this issue in their initial brief to this court. We therefore deem the issue abandoned. See United States v. Nealy, 232 F.3d 825, 830-31 (11th Cir. 2000) ("Defendant abandoned the . . . issue by not raising the issue in his initial brief.").

Even if we were to cast the Al Najjars' egregious default aside, their argument here would fail. In both Mazen's and Fedaa's decisions, the BIA expressly declared that "no classified information was considered by the Board in deciding the instant appeal and motion to remand." See Mazen's Oct. 1999 BIA Decision, supra, at 1 n.2; Fedaa's Oct. 1999 BIA Decision, supra, at

jurisdictionally precluded from admitting the proffered newspaper articles describing the custody proceedings, we may, and do, take judicial notice of the fact that Mazen's custody proceeding occurred and the subject matter thereof. See In re Delta Resources, Inc., 54 F.3d 722, 725 (11th Cir. 1995) ("[T]his Court may take judicial 'notice of another court's order . . . for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation and related filings."). We will not take judicial notice of any factual findings, legal conclusions, or arguments advanced in the custody proceedings, and we will not consider these proceedings as impacting any of the Al Najjars' claims on appeal. See 8 U.S.C. § 1105a(a)(4). In sum, we take judicial notice of the fact that Mazen's custody proceedings occurred, and the subject matter thereof, although we will not rely on these proceedings in reviewing the BIA's decisions.

We also deny the Al Najjars' request for judicial notice of United States treaties with Saudi Arabia, the UAE, and Israel. Not only is our review limited to the administrative record created below, see 8 U.S.C. § 1105a(a)(4), but arguments which were not raised at the administrative level may not be interposed on appeal,

---

1 n.1. The Al Najjars offer no credible reason why we should assume improper influence in the face of this statement. See Shaughnessy v. Accardi, 349 U.S. 280, 283, 75 S. Ct. 746, 748 (1955) (reversing the Second Circuit's finding of improper influence because "speculation on the effect of subconscious psychological pressures [does not] provide[ ] sufficient justification for rejecting the District Court's findings" that "the Board's decisions represented the free and undictated decision of each member").

see 8 U.S.C. § 1105a(c).  Nowhere in the record do the Al Najjars argue that treaties preclude their return to the UAE or Saudi Arabia.  Therefore, it would be improper for us to consider these arguments and the non-record facts on which they are based.  See Richardson I, 162 F.3d at 1373; Ka Fung Chan, 634 F.2d 248, 258 (5th Cir. 1981) ("Under 8 U.S.C. § 1105a(c), this failure to exhaust administrative remedies precludes review of [the] . . . arguments in this court").

For the foregoing reasons, we decline, pursuant to 8 U.S.C.  §§ 1105a and IIRIRA § 309(c)(4)(B), to entertain evidence on appeal that is not contained in the administrative record and was not presented below.[13]  Accordingly, review of the Al Najjars' petitions shall be limited to the administrative record created below.

## C.  Standard of Review

---

[13]Our strict application of § 1105a(a)(4) in conjunction with IIRIRA § 309(c)(4)(B) does not divest litigants of an opportunity to present new evidence; it merely forces them to follow INS procedure.  Under 8 C.F.R. § 3.2(c), an alien may make a timely motion to reopen his or her case so that new evidence may be tendered and considered.  See 8 C.F.R. § 3.2(c) (2001); Meghani, 236 F.3d at 848.  A motion to reopen filed with the immigration courts -- and not a motion for judicial notice lodged with the reviewing court -- is the appropriate vehicle through which to present new evidence.  See Varela v. INS, 204 F.3d 1237, 1239 n.4 (9th Cir. 2000) ("A motion to reopen is the correct motion to file when seeking to present new facts not already in evidence.");  Lara, 216 F.3d at 499 n.13 (same).  This is especially true in a transitional alien's case.  See IIRIRA § 309(c)(4)(B).

Our discussion of the INA's reopening procedure is not intended as a comment on the Al Najjars' rights to a reopening of their deportation proceedings.  Such procedures have time limitations, and other restrictions, and these issues are not before this court at this time.  See 8 C.F.R. § 3.2(c). Instead, we mention this only to alert litigants that they can file a timely motion to reopen in the immigration courts under appropriate circumstances, although §1105a(a)(4) and IIRIRA §309(c)(4)(B) preclude the presentation of new evidence in the court of appeals.

33

"The appropriate standard of review is well-settled." Mazariegos, 241 F.3d at 1323. "A factual determination by the BIA that an alien is statutorily ineligible for asylum or withholding is reviewed under the substantial evidence test." Perlera-Escobar v. Executive Office for Immigration, 894 F.2d 1292, 1296 (11th Cir. 1990) (per curiam). This means that the reviewing court must affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Lorisme v. INS, 129 F.3d 1441, 1444-45 (11th Cir. 1997) (quoting 8 U.S.C. § 1105a(a)(4)). We have repeatedly emphasized that the test is highly deferential, see id. at 1444-45; Mazariegos, 241 F.3d at 1323, and that "[w]e must defer to the BIA unless 'a reasonable factfinder would have to conclude that the requisite fear of persecution existed.'" Lorsime, 129 F.3d at 1445 (quoting Elias-Zacarias, 502 U.S. at 481, 112 S. Ct. at 815); Mazariegos, 241 F.3d at 1323. While we consider the BIA's interpretation of applicable statutes de novo, INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48, 107 S. Ct. 1207, 1221-22 (1987), "we are also obliged . . . to defer to the BIA's interpretation . . . if that interpretation is reasonable." Perlera-Escobar, 894 F.2d at 1296; see also INS v. Aguirre-Aguirre, 526 U.S. 415, 424, 119 S. Ct. 1439, 1445-46 (1999).

We review only the Board's decision, except to the extent that it expressly adopts the IJ's opinion. See Garrovillas v. INS, 156 F.3d 1010, 1013 (9th Cir.

34

1998). Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well. See Prado-Gonzalez v. INS, 75 F.3d 631, 632 (11th Cir. 1996) (per curiam). In the Al Najjars' cases, the BIA expressly adopted the IJ's decisions and affirmed for the "reasons set forth therein." Thus, we review the IJ's analysis as if it were the Board's.

### D. Asylum

The INA provides that "[a]ny alien who is physically present in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (1999). "The Attorney General may grant asylum to an alien ... if the Attorney General determines that such alien is a refugee within the meaning of § 1101(a)(42)(A) of [Title 8]." 8 U.S.C. § 1158(b)(1). In turn, a "refugee" is defined as:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A).

A grant of asylum entails two steps. First, the applicant must demonstrate that he or she is a "refugee" within the meaning of INA § 101(a)(42)(A), 8 U.S.C.

35

§ 1101(a)(42)(A). It is the asylum applicant who bears the burden of proving such statutory "refugee" status. See 8 C.F.R. § 208.13(a) (2001). Once the alien demonstrates that he or she is a "refugee" within the meaning of the INA, the decision to grant asylum is committed to the Attorney General's discretion, which has been delegated to Board. See 8 C.F.R. § 3.1(d)(1) (2001). "Both this court and the Supreme Court have emphasized that 'an alien who satisfies the [applicable standard for asylum] does not have a right to remain in the United States; he or she is simply eligible for asylum, if the Attorney General, in [her] discretion, chooses to grant it.'" Lorisme, 129 F.3d at 1444 (emphasis in original).

In reviewing the Al Najjars' cases, the BIA concluded that the IJ "properly held . . . that the respondent[s] did not meet [the] burden of demonstrating a 'well-founded fear of persecution' on account of race, religion, nationality, or membership in a particular social group, or on account of a political opinion, whether actual or imputed." In finding that the Al Najjars failed to establish statutory asylum eligibility, the immigration courts did not address the second prong of the asylum inquiry – discretion. Thus, on appeal, only the question of statutory eligibility is at issue. After a thorough review of the entire administrative record, we find the BIA's conclusion that the Al Najjars failed to demonstrate any "well-founded fear of persecution on account" of any statutory factor to be

36

"supported by reasonable, substantial, and probative evidence on the record considered as a whole." See 8 U.S.C. § 1105a(a)(4); Perlera-Escobar, 894 F.2d at 1296.

Before this court, the Al Najjars advance three articulations of error in the finding that they failed to establish a "well-founded fear of persecution."[14] First, they claim that they will be persecuted in the UAE and Saudi Arabia because of their actual political opinion advocating Palestinian self-determination, which has been made public to the governments in the proposed countries of removal due to the United States' allegations against Mazen and the proliferation of news accounts regarding WISE, ICP, and those associated therewith. Second, the Al Najjars argue that terrorist sympathies attributed to Mazen by the media and the United

---

[14] We refuse to consider the Al Najjars' argument that they are entitled to asylum as "refugees sur place" as defined by the United Nations High Commissioner's *Handbook on Procedures Criteria for Determining Refugee Statute Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 94-96 (Geneva 1992). Under § 1105a(c), we are divested of jurisdiction to consider a claim which was not presented to the immigration courts, "as an alien must exhaust the administrative remedies available to him prior to obtaining judicial review." Asencio v. INS, 37 F.3d 614, 615-16 (11th Cir. 1994) (per curiam). The Al Najjars failed to satisfy these exhaustion requirements and, therefore, we have no jurisdiction to consider this argument on appeal. See id. Furthermore, we note that to demonstrate asylum eligibility, an alien must prove he or she is a "refugee" within the meaning of the INA. Because "refugee sur place" is not a statutory designation, it is doubtful that such a classification could help the Al Najjars demonstrate "refugee" status. See Aguirre-Aguirre, 526 U.S. at 427-28, 119 S. Ct. at 1446-47 ("[t]he U.N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the BIA, or United States courts."); Cardoza-Fonseca, 480 U.S. at 439 n.22, 107 S. Ct. at 1217 n.22 (resorting to the Handbook as *one* of a number of grounds, including the statute itself and precedent, for an interpretation of "well-founded fear").

States government, regardless of their veracity, will cause them persecution in the UAE and Saudi Arabia on account of an <u>imputed</u> political opinion.[15] Lastly, the Al Najjars contend that substantial record evidence established that they would be denied entry into the UAE and Saudi Arabia because of their Palestinian ancestry. We address each argument in turn.

### 1. Actual Political Opinion

First, the Al Najjars argue that they demonstrated "well-founded fear of persecution" on the grounds of their actual political opinion in Palestinian self-determination and opposition to the Israeli occupation of Palestinian territories. We utilize a very deferential substantial evidence test to review the IJ's factual

---

[15] After the IJ issued orders of deportation against the Al Najjars, Mazen was detained by the INS on the basis of classified evidence purporting to show that he was a threat to national security. As previously noted, on appeal, the Al Najjars have repeatedly asserted that the imputed political opinions springing from Mazen's detainment impact their asylum claims. Nonetheless, the Al Najjars concede that the BIA did not consider any evidence of Mazen's detainment in reviewing their appeals. For instance, the Al Najjars admit that the BIA "did not take into consideration the change in circumstances and probability for persecution or torture which would result if the Dr. Al Najjar and his wife were returned to Israel, the UAE, Saudi Arabia or Egypt." Appellant Mazen's Opening Brief at 9. We agree.
In both Mazen's and Fedaa's cases, the BIA "affirm[ed] the Immigration Judge's decision for the reasons set forth therein" and emphatically declared that "no classified information was considered by the Board in deciding the instant appeal and motion to remand." Thus, it is apparent that the BIA only considered the evidence before the IJ which pertained solely to imputed opinions, if any, directed at the Al Najjars. Since Mazen was arrested after the IJ decisions, it follows that none of the imputed opinions springing from Mazen's detainment was considered by the BIA or IJ. Accordingly, we will consider only those political opinions imputed to the Al Najjars prior to Mazen's detainment, as we are empowered to review decisions based only on record evidence. See 8 U.S.C. § 1105a(a)(4). To the extent we recognize Mazen's custody proceedings, we decline to place any reliance thereon in reviewing the immigration courts' decisions on the asylum petitions.

38

determination to the contrary. See Elias-Zacarias, 502 U.S. at 481; 112 S. Ct. at 815. We will reverse the denial of asylum only if the evidence presented by the applicant is so overwhelming "that a reasonable factfinder would have to conclude that the requisite fear of persecution exists." Mazariegos, 241 F.3d at 1323-24 (emphasis in original).

There is substantial record evidence demonstrating Mazen's personal belief and outspoken advocacy for Palestinian autonomy. Before the IJ, Mazen testified that he did not agree with the Israeli occupation of the Palestinian territories. The record further reveals that Mazen helped begin a think-tank, WISE, which was ostensibly committed to "educat[ing] the public about Islamic issues through research, publishing and seminars." Mazen volunteered countless hours to the activities of WISE, and the resume he submitted to the immigration court indicates that he was the Executive Director of WISE from 1990 until the organization dissolved in the mid-nineties. WISE produced various seminars and journals that focused on the issue of the Israeli-Palestinian conflict, and advocated autonomy and self-determination for Palestine. Mazen acted as an editor in the publication of many of these journals and was a speaker regarding Palestinian issues at some of the WISE-sponsored conferences. Based on these offers of proof, there is reasonable, substantial, and probative evidence on the record as a whole

39

demonstrating Mazen's actual belief in Palestinian self-determination.[16]

Demonstrating one's political opinion, however, is merely one component of the

"refugee" inquiry.[17]  See 8 U.S.C. § 1101(a)(42)(A).

To be eligible for asylum, the alien must establish a "well-founded fear" that

his or her political opinion (or other statutorily listed factor) will cause harm or

suffering that rises to the level of "persecution."  See 8 U.S.C. § 1101(a)(42)(A).

"Demonstrating such a connection requires the alien to present 'specific, detailed

facts showing a good reason to fear that he or she will be singled out for

persecution'" on account of such an opinion.  Faddoul v. INS, 37 F.3d 185, 188

(5th Cir. 1994)[18] (quoting Zulbeari v. INS, 963 F.2d 999, 1000 (7th Cir. 1992));

---

[16] Fedaa did not testify regarding the substance of her actual political opinions; no witness attested that she believed in Palestinian autonomy or self-determination; and there was no documentary evidence which purported to attribute such an ideology to her.  Accordingly, there is substantial evidence to support the IJ's determination that Fedaa failed to demonstrate that her actual political opinions were hostile to the Saudi government. See Faddoul v. INS, 37 F.3d 185, 188 (5th Cir. 1994) (an alien must "present 'specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution'").  Thus, it follows that there is substantial evidence in the record to uphold the IJ's finding that she failed to demonstrate a well-founded fear of persecution on account of her actual political opinions.

[17] Mazen need not prove that the UAE has actual knowledge of his allegedly offensive political opinions regarding Palestine. "While evidence that authorities lie in wait to punish an asylum applicant would certainly strengthen any petition to the Board, it is not evidence necessary to the 'well-founded fear' inquiry." Najafi v. INS, 104 F.3d 943, 949 (7th Cir. 1997) (reversing the immigration courts for requiring an Iranian who converted to Christianity to prove that the Iranian government had knowledge of his apostasy); Osaghae v. INS, 942 F.2d 1160, 1164 (7th Cir. 1991) ("Asylum is not limited to the notorious."). Instead, evidence that the removal country has knowledge of the asylum applicant's political opinion is merely probative, and not dispositive, of the strength of his or her "well-founded fear."

[18] By citing and relying on Faddoul, we do not imply concurrence with the Fifth Circuit's definition of "persecution" in that case.  See 189 F.3d at 188 (construing "persecution" "as

Rezai v. INS, 62 F.3d 1286, 1289 (10th Cir. 1995) (alien "must present specific, credible evidence to support his claim that he has been persecuted or will be persecuted if deported"); M.A. v. U.S. INS, 899 F.2d 304, 311 (4th Cir. 1990) (en banc) ("To validate the 'well-foundedness' of his fear, [the alien] must set forth specific, concrete facts.").

Mazen failed to demonstrate that he possessed a "well-founded fear" of persecution in the UAE on account of his actual political opinion regarding Palestinian autonomy. The voluminous record in this case contains only a few documents cataloguing political and social conditions in the UAE. While some of the media reports in the record contain isolated comments about political conditions in various Middle Eastern countries, none offers any facts that are relevant to this vein of Mazen's argument. Instead, the primary offer of documentary proof regarding conditions in the UAE (and Saudi Arabia) derives from reports published by the Department of State regarding human rights practices. See U.S. DEPARTMENT OF STATE, COUNTRY REPORTS ON

requiring 'a showing by the alien that 'harm of suffering will be inflicted upon [her] in order to punish"). Neither the scope nor definition of "persecution" is at issue in the instant case, and we need not determine the precise contours of the term at this time. The Al Najjars have failed to demonstrate a "well-founded fear" of persecution under any of the extant formulations of the standard.

41

HUMAN RIGHTS PRACTICES FOR 1995, at 1249 (Saudi Arabia), at 1274 (UAE) ("Department of State Report" or "DOS Report").

The 1995 Department of State Report, however, not only discounts Mazen's argument here; it rebuts it. First, the DOS Report states that there have been no reports of politically motivated disappearances or torture at the hands of the Emirate government. See DOS Report, supra, at 1276. Then, the Report explains that there have been no reported political prisoners in the UAE. See id. Thus, there is no reason to think that Mazen will be jailed for his political beliefs, whatever they may be.

Cutting even further against Mazen's position, the DOS Report indicates that the Emirate government is not hostile to Mazen's ideology, but in fact sympathizes with his position regarding Palestinian autonomy. The Report explains that, commensurate with the country's censorship policies, officials with the Ministry of Information and Culture censor foreign periodicals, books, and broadcasting programs to weed out material that the government wishes to suppress. See id. at 1277. Predominately, the censored material is that which is contrary to Islam, such as pornography, but the Ministry also censors that which is derogatory to the Emirate government and material that is "favorable to Israel." Id. Insofar as the UAE has a policy of censoring materials that are favorable to Israel, the UAE has

an official position that is similar to Mazen's advocacy against Israel and in favor of Palestinian self-determination.  Because Mazen's actual political opinions are, at the very least, not in conflict with the official policy of the UAE, we fail to see any threat that Mazen will be persecuted by the Emirate government for his actual convictions.  Accordingly, we find substantial evidence supporting the IJ's determination that Mazen failed to establish a well-founded fear of persecution based on his actual political opinion in Palestinian self-determination.

To the extent Mazen argues that he will suffer persecution on account of the official stifling of academic freedom and political advocacy in the UAE, we reject his argument.  The DOS Report explains that the UAE's Provisional Constitution creates freedom of speech, but, in practice, this freedom is rather limited.  See id. at 1276.  There are unwritten but generally recognized bans on criticism of the government, and the UAE prohibits the formation of political parties.  See DOS Report, supra, at 1277.  These restrictions are insufficient to amount to persecution.

First, Mazen testified that he has never criticized the Emirate government.  Because Mazen has never articulated the forbidden speech, we fail to see why his academic advocacy would be officially silenced by the Emirate authorities.  Second, and more importantly, "[p]olitical conditions 'which affect the populace as

a whole or in large part are generally insufficient to establish [persecution].'"

Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000) (quoting Mitev v. INS, 67

F.3d 1325, 1330 (7th Cir. 1995)).  Because any governmental bar on political

advocacy, association, or free speech is applicable to the general population of the

UAE, these social constraints do not amount to persecution on the grounds of

political opinion.  See id.

## 2.  Imputed Political Opinion

Next, the Al Najjars argue that it was an abuse of discretion for the IJ and

BIA to reject their asylum claims as to Saudi Arabia and the UAE, because

allegations of terrorist associations, regardless of their veracity, create terrorist

opinions imputed to them by the United States government and media which will

cause persecution.  Specifically, the Al Najjars contend that their imputed

association and affiliation with the PIJ, Intifada, Hamas and/or other militant

Islamic organizations will cause them persecution in the UAE and Saudi Arabia.[19]

_____

[19] The Immigration Act of 1990 created an exclusion ground for any alien who has "engaged in terrorist activity," or any "alien who the consular officer or the INS knows, or has reason to believe, is likely to engage in terrorist activity after entry." INA §§ 212(a)(3)(B)(i)(I) and (II), 8 U.S.C. §§ 1182(a)(3)(B)(i)(I) and (II).  Upon the passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA") in 1996, Congress expanded the category of aliens excludable as terrorists under § 212(a)(3)(B)(i) to include "representatives of a foreign terrorist organization," and "member[s] of a foreign terrorist organization."  See INA §§ 212(a)(3)(B)(i)(III) and (IV), 8 U.S.C. §§ 1182(a)(3)(B)(i)(III) and (IV) (1999).  Neither the 1990 Immigration Act nor AEDPA's provisions relating to terrorists or terrorist organizations are at issue in this case.  At no point in these proceedings has the INS argued that Mazen or Fedaa falls under INA § 212(a)(3)(B)(i).  Instead, as previously noted, the Service offered evidence

44

"[A]n imputed political opinion, whether correctly or incorrectly attributed," may constitute a ground for a "well-founded fear" of political persecution within the meaning of the INA. Morales v. INS, 208 F.3d 323, 331 (1st Cir. 2000). See, e.g., Lwin v. INS, 144 F.3d 505, 509 (7th Cir. 1998); Cruz-Diaz v. U.S. INS, 86 F.3d 330, 331-32 (4th Cir. 1996) (per curiam); Canas-Segovia v. INS, 970 F.2d 599, 601-02 (9th Cir. 1992); Matter of S-P-, 21 I&N Dec. 486 (BIA 1996) ("Persecution for 'imputed' grounds (e.g., where one is erroneously thought to hold particular political opinions or mistakenly believed to be a member of a religious sect) can satisfy the 'refugee' definition." ). "An asylum applicant may prevail on a theory of 'imputed political opinion' if he shows that the '[p]ersecutor falsely attribute[d] an opinion to [him], and then persecute[d] [him] because of that mistaken belief about [his] views.'" Chanchavac v. INS, 207 F.3d 584, 591 (9th Cir. 2000) (quoting Canas-Segovia, 970 F.2d at 601-02).

Even if we were to find that Saudi Arabia and the UAE would impute terrorist opinions to Mazen and Fedaa, the Al Najjars would still be required to demonstrate that they have a "well-founded fear of persecution" because of that

purporting to show Mazen's association with terrorists solely to mitigate the immigration court's exercise of discretion in the Al Najjars' favor. Therefore, while the INA contemplates that, under certain circumstances, terrorist loyalties may disqualify an alien for affirmative relief under the INA, these provisions are not at issue in this case. Furthermore, given our disposition of the Al Najjars' petition, we express no opinion whether imputed or actual terrorist opinions may disqualify an alien for affirmative relief under the INA.

45

imputed political opinion. The Al Najjars failed to offer any evidence of such a well-founded fear, and they certainly have not satisfied the heavy burden on asylum applicants arguing that the BIA erred in its factual determination that they are statutorily ineligible for asylum. Accordingly, we need not decide whether the Al Najjars demonstrated the imputation of terrorist opinions. Instead, we review the BIA's finding that the Al Najjars failed to demonstrate past persecution or a "well-founded fear" of future persecution on account of such an opinion. See Elias Zacarias, 502 U.S. at 483, 112 S. Ct. at 816 (concluding that because the alien failed to demonstrate a "well-founded fear," the Court "need not decide whether the evidence compels the conclusion that [the alien] held a political opinion," because "[e]ven if it does, [the alien] still has to establish that the record also compels the conclusion that he has a 'well-founded fear' . . . [of] persecut[ion] . . . because of that political opinion.") (emphasis in original).

While the precise contours of the "well-founded fear" inquiry continue to evolve, it is well-established that it has both an objective and subjective component. What this means is that an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable. See Mgoian v. INS, 184 F.3d 1029, 1035 (9th Cir. 1999); Sayaxing v. INS, 179 F.3d 515, 519-20 (7th Cir. 1999) (same); Mikhailevitch v. INS, 146 F.3d 384, 389 (6th Cir. 1998)

46

(same); Nazaraghaie v. INS, 102 F.3d 460, 462 (10th Cir. 1996) (same); Ghasemimehr v. INS, 7 F.3d 1389, 1390 (8th Cir.1993) (per curiam) (same); Guevara Flores v. INS, 786 F.2d 1242, 1249 (5th Cir. 1986) ("An alien possesses a well-founded fear of persecution if a reasonable person in her circumstances would fear persecution if she were to be returned to her native country."). The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution. See Mgoian, 184 F.3d at 1035. In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a "good reason to fear future persecution." Id.

Mazen failed to prove both the objective and subjective components of his well-founded fear based on imputed political opinions. The record is devoid of evidence that the Emirate government has ever detained, arrested, tortured, or otherwise harmed any suspected member of the PIJ or other Islamic terrorist group opposed to the Israeli-Palestinian peace process, much less one who merely is alleged to have some association with such a group. Indeed, there was no record evidence indicating that the UAE feels threatened from terrorist acts in Israel or in any way sympathizes with the Israeli government. Instead, Department of State Reports indicate that the UAE is a predominatingly Arab nation, with a devoutly Muslim population and a large number of Palestinian refugees. If anything, this

47

indicates that the UAE is likely to be sympathetic to the plight of the Palestinians, not the Israelis. Whatever inferences may be drawn from this Report, however, are not within our province to make, since Mazen was required to demonstrate "'specific, detailed facts showing a good reason to fear that he . . . will be singled out for persecution.'" Faddoul, 37 F.3d at 188. He failed to offer any proof that the Emirate government has a history of persecuting terrorists, members of the PIJ, or any other individual with a similar ideology, much less one who is merely alleged to have some association therewith. He likewise failed to present evidence that fear of such future suffering is reasonable.[20]

Mazen failed to establish the subjective component as well. During his testimony, when asked whether he feared persecution in the UAE, Mazen recited only his fear of discrimination on the basis of his Palestinian ancestry. At no time during the hearings before the IJ did Mazen testify that he "genuinely fears persecution" in UAE on account of imputed terrorist loyalties, and there is no other record evidence indicating that he possessed such a fear.

---

[20] Mazen suggests vaguely that this court should simply assume he will be persecuted because there have been public allegations that he has had some association with the PIJ or other similar terrorist groups. However, the law requires that Mazen demonstrate specific, detailed facts showing good reason to fear that he will be singled out for persecution. This he has failed to do. On this record, and in light of our deferential scope of review, we cannot conclude that the findings of the IJ and BIA were lacking substantial support.

48

The "denial of asylum may be reversed <u>only</u> if the evidence presented by the applicant is so powerful that a reasonable factfinder would <u>have</u> to conclude that the requisite fear of persecution exists." <u>Mazariegos</u>, 241 F.3d at 1323-24. Mazen failed to present such evidence below. Accordingly, we cannot say that the IJ lacked a substantial basis for its conclusion that Mazen's fears of persecution in the UAE on account of imputed political opinion were not well-founded.

We likewise see no reason to disturb the IJ's finding that Fedaa's fear of persecution due to imputed political opinions was not well-founded. Not only did she fail to present any evidence that she personally and genuinely feared persecution due to imputed terrorist opinions, but she also failed to demonstrate that Saudi Arabia has persecuted suspected members of the PIJ or individuals opposed to the Israeli-Palestinian peace process, much less the spouse of a person who is merely alleged to have some association with such a group.[21] Likewise,

---

[21] The Department of State Report contained in the record tells the story of Muhammed Al-Mas'ari, spokesman for the Committee for the Defense of Legitimate Rights ("CDLR"). The CDLR was established in 1993 to advocate a "rigidly Islamic fundamentalist approach." DOS Report, <u>supra</u>, at 1253. Among other things, CDLR spokesman, Al-Mas'ari has expressed opposition to the Saudi King and high level government officials, as well as "opposition to peace with Israel and to Saudi support for the peace process." <u>Id.</u> After Al-Mas'ari fled Saudi security forces, fifteen to twenty of his relatives and supporters were arrested. Some were sentenced to prison terms and at least one has been executed by the Saudi government.

This account prompts us to consider whether Saudi Arabia supports Israel in the Palestinian-Israeli clash, and to ask whether the Saudis arrested CDLR supporters for expressing opposition to the Israeli-Peace process. We conclude that the foregoing story is not sufficiently specific or telling to demonstrate either. "Although other inferences . . . may be drawn [from this account], it is not our task to do so as long as substantial evidence supports the BIA's

there was no showing that suspected members of the PIJ or other similar terrorist group will be persecuted by Saudi Arabia in the future. Accordingly, we affirm the IJ's finding that Fedaa "failed to provide evidence that published allegations regarding her husband would subject her to persecution."

### 3. Denial of Entry

Lastly, the Al Najjars claim that they will be denied entry into the UAE and Saudi Arabia because of their status as stateless Palestinians, which they claim constitutes persecution on account of nationality. The IJ rejected this argument, finding that "persecution based on denial of entry was not established" as to Fedaa or Mazen. In so doing, the IJ relied on Faddoul v. INS, 37 F.3d 185 (5th Cir. 1994). In Faddoul, a Saudi-born Palestinian argued that Saudi Arabia's denial of exit and re-entry privileges to Palestinians born in Saudi Arabia constitutes persecution. The Fifth Circuit rejected this argument, reasoning that even though "Saudi Arabia . . . denies Palestinians certain rights enjoyed by Saudi citizens, the

---

conclusion." Perlera-Escobar, 894 F.2d at 1299. An alien must demonstrate "'specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution.'" Faddoul, 37 F.3d at 188. The story of the CDLR members does not satisfy such a strong showing and therefore, is insufficient, standing alone, to undercut the IJ's determination that Fedaa failed to demonstrate a well-founded fear of persecution on account of imputed political opinions. In light of the limited scope of our review, we are not at liberty to reject the inferences which the IJ and BIA accepted -- i.e., that the Saudis arrested the CDLR supporters because of their opposition to the Saudi King and high level governmental officials -- and instead to adopt the inference more favorable to Fedaa's position which the IJ and BIA rejected.

50

government does not single out Palestinians for such discriminatory treatment." Id. at 188. Instead, Saudi law grants citizenship based solely on Saudi ancestry. The Fifth Circuit reasoned that Saudi Arabia's "method of conferring citizenship does not amount to persecution" of Palestinians because all non-Saudis are subject to the same entry and exit restrictions. Id. at 189.

Fedaa's claim of persecution based on a denial of entry mirrors Faddoul's. She asserts that because she is of Palestinian ancestry, she will be denied citizenship and/or entry into Saudi Arabia, which constitutes persecution under the Act. As Faddoul recognizes, however, Saudi law grants citizenship solely based on ancestry. This means that the Saudi government does not single out Palestinians for discriminatory treatment. Thus, such treatment does not amount to persecution under the INA. See id.

Although Fedaa is not legally entitled to become a Saudi citizen, the Saudis permit nonimmigrant resident refugees to retain Saudi re-entry visas if they return to the country at least every six months. Fedaa procured a Saudi re-entry visa prior to coming to the United States, and since she has been here, she has failed to follow the visa's conditions which caused it to expire. The cancellation of Fedaa's visa had nothing to do with her Palestinian ancestry; it was caused by Fedaa's failure to follow the terms of her visa. Now that her visa is expired, Fedaa's ability

51

to return to Saudi Arabia is contingent on Saudi Arabia's generally applicable policies concerning nonimmigrant refugees. There has been no evidence that these policies single out Palestinian refugees for discriminatory treatment. Instead, testimony offered to the IJ indicates that if Fedaa's entry were sponsored by an employer, like that of other non-Saudis, she could obtain a work permit and return to Saudi Arabia, regardless of her ancestry. The significant fact about the instant record is that Fedaa has failed to demonstrate that if she is denied such a visa, it will be <u>because of</u> her Palestinian ancestry. Indeed, there is nothing in the record to indicate that Saudi Arabia will deny Fedaa an entry visa <u>because </u>she is of Palestinian descent.

To reverse a determination that an alien is statutorily ineligible for asylum, there must be record evidence that is so compelling that a reasonable factfinder would be compelled to reach a conclusion contrary to that of the BIA. Here, we have not been presented with any evidence that the Saudis will deny Fedaa entry, or that if such a denial occurred it would be due to her nationality. Therefore, we find substantial, reasonable, and probative evidence supporting the IJ's conclusion that Fedaa failed to establish a "well-founded fear" that she would be denied entry on account of her nationality.

52

With respect to Mazen's denial of entry claim, we likewise find substantial evidence supporting the IJ's conclusion that persecution on this basis was not established. Much like Saudi Arabia, the UAE grants citizenship based on ancestry and/or marriage. Neither Mazen nor his family is eligible to become citizens of the UAE, since they are of Palestinian origin. There are no formal procedures for accepting refugees into the UAE. See DOS Report, supra, at 1277. Nonetheless, Mazen testified that nonimmigrant refugees may receive temporary residence permits from the Emirate government.

Mazen's siblings have procured temporary residence permits from the Emirate government and reside in the UAE at this time. Further, Mazen's father worked for the Ministry of Education in the UAE for over twenty-years, and his parents presently reside in the UAE at least one-half of the year utilizing temporary residence permits. Mazen failed to explain why he would be ineligible for such a permit. Moreover, he has failed to offer any evidence that the Emirate government has ever, or will ever, deny temporary resident permits on the basis of Palestinian ancestry. Not only do Mazen's Palestinian parents and siblings possess such documents, but Mazen himself had such a temporary permit before he moved to the United States. For the foregoing reasons, we find substantial evidence

supporting the IJ's determination that Mazen's fear that he will be denied entry into the UAE on account of his nationality is not well-founded.[22]

### E. **Withholding of Deportation**

We have held that "reasonable, substantial and probative evidence in the record considered as a whole," see 8 U.S.C. § 1105a(a)(4), supports the BIA's denial of asylum to the Al Najjars. Where "an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of deportation." Nkacoang v. INS, 83 F.3d 353, 355 (11th Cir. 1996); Guevara-Flores v. INS, 786 F.2d 1242, 1250 (5th Cir. 1986) ("[T]he evidentiary burden for establishing entitlement to withholding of deportation should be greater than that imposed on aliens who seek asylum."). The Al Najjars have not explained why the general rule is inapplicable to them. Because the Al Najjars failed to demonstrate a "well-founded fear of persecution" sufficient to support an asylum claim, the BIA properly found that the Al Najjars were unable to satisfy the greater burden attending a request for withholding of removal.

---

[22] To the extent that the Al Najjars contend that they will be denied entry into the UAE and Saudi Arabia on account of imputed terrorist opinions, we likewise reject this argument, as there is no record evidence that the UAE and Saudi Arabia have ever, or will ever, exclude individuals with such opinions. Accordingly, we find substantial, probative evidence supporting the BIA's finding that the Al Najjars failed to demonstrate persecution on such a ground.

### F. Asylum & Withholding Testing Countries

Next, the Al Najjars argue that they are natives of Palestine and that the BIA abused its discretion in determining that the UAE and Saudi Arabia were the appropriate countries for consideration of their asylum and withholding claims. The Al Najjars contend that they are stateless and argue that the IJ should have tested their petitions by reference to Israel, the country with political control over their homeland in Palestine.

The statutory methodology for determining the potential country of deportation is different from that utilized to pinpoint the asylum testing country. Compare 8 U.S.C. § 1101(a)(42)(A), with 8 U.S.C. § 1253(a) (1995) (repealed by IIRIRA § 307(a), now codified at INA § 241, 8 U.S.C. §1231(b)). Because these statutory provisions contemplate different procedures, we address the argument as to asylum and withholding separately.

Beginning with the Al Najjars' asylum claims, the INS contends that Emirate and Saudi residence was appropriate because a "refugee" for purposes of asylum is tested by reference to the "country of such person's nationality, or in the case of a person having no nationality, . . . any country in which such person last habitually resided." 8 U.S.C. § 1101(a)(42)(A). Since the Al Najjars repeatedly asserted they were stateless Palestinians, the Service argues that the BIA was

required by § 1101(a)(42)(A) to test their asylum claims by reference to the country in which they "last habitually resided." The Al Najjars counter that their nationality is Palestinian and, therefore, that Israel should have been designated as the asylum testing country.

"[S]tatelessness alone does not warrant asylum," as all asylum applicants must demonstrate the same well-founded fear of persecution under INA §101(a)(42)(A). See Faddoul, 37 F.3d at 190. Indeed, the INA expressly contemplates that there will be asylum applicants with a "nationality," and those with "no nationality." See 8 U.S.C. § 1101(a)(42)(A). In the case of an applicant with "no nationality," section 1101(a)(42)(A) tests the petition by reference to the country of "last habitual residence." See id. This means that where an applicant is stateless, the "well-founded fear" inquiry may be directed to the individual's "last habitual residence," and not the country of the alien's "nationality."

Before the BIA and IJ, the Al Najjars consistently argued that they were stateless Palestinians, and we will not permit them to interpose a different argument on appeal. See 8 U.S.C. § 1105a(c). Thus, to the extent that the Al Najjars now argue in their brief to this court and in oral argument that their asylum claim should be tested by reference to Israel, we refuse to consider this argument

because it was not raised below.[23]   We will, however, consider the other articulation of the Al Najjars' argument which was argued before the immigration courts: whether the IJ improperly identified the UAE and Saudi Arabia as the Al Najjars' "last habitual residence."

The "last habitual residence" designation  is a question of fact.  As such, we review this conclusion under a deferential substantial evidence test.  See Mazariegos, 241 F.3d at 1323-24.  The IJ made implicit, but not explicit, findings on the question of "last habitual residence."  We find substantial record evidence supporting these implicit findings.

Although Fedaa is of Palestinian ancestry, she was born in Saudi Arabia and lived there with her parents and siblings for twenty-three years before coming to the United States.  Fedaa attended secondary school and college in Saudi Arabia.

---

[23] The Al Najjars claim, raised for the first time on appeal, that Israel should have been used as the asylum testing country, was not raised below and is belied by their position before the immigration courts.  Before the IJ, the Al Najjars consistently asserted that they were stateless Palestinians with legal residency rights in no country in the world.  In their petitions for asylum, suspension, and withholding, both Fedaa and Mazen listed their "Citizenship" as "Stateless" and before the IJ, the Al Najjars' attorney stressed the fact that neither Fedaa or Mazen had legal citizenship rights anywhere in the world.  After the IJ designated the UAE and Saudi Arabia as the proper asylum testing countries under the statute, the Al Najjars appealed to the BIA and did not in any way challenge the IJ's designation of the UAE and Saudi Arabia as the asylum testing countries.  Not only did the Al Najjars fail to raise, or even vaguely argue, this issue of Israeli "nationality" below -- which is enough to preclude consideration of this argument in the court of appeals – but this argument is wholly inconsistent with their position of statelessness, which they unwaveringly adhered to in the immigration courts.

In fact, other than her residence in Tampa, Florida, Fedaa has lived in no other country. Furthermore, almost every living member of Fedaa's close family presently resides in Riyadh, Saudi Arabia. Thus, we readily conclude that there is substantial evidence supporting the IJ's determination that Saudi Arabia is Fedaa's "last habitual residence."

As for Mazen, he was born in Palestine and lived there for only one year before moving to Saudi Arabia and residing there for thirteen years with his parents and five siblings. Thereafter, Mazen moved to Egypt, living there for eight years. After completing his bachelor's degree at a university in Egypt, Mazen moved to the UAE in 1979. He lived in the UAE until 1981, working for a consulting firm in a construction business in Ajman, UAE. Upon leaving the UAE, Mazen ventured to the United States to commence his master's work in North Carolina.

At the hearing before the IJ, Mazen's attorney stated that he was offering evidence regarding the UAE as relevant to the "issue of political asylum, because that's his last area of habitual abode." Indeed, before the IJ and BIA, Mazen never contested the designation of the UAE as his "last habitual residence." Despite this, Mazen asks us to entertain his complaints on this issue. We will not consider arguments raised for the first time on appeal. See 8 U.S.C. § 1105a(c); Asencio v.

INS, 37 F.3d 614, 615-16 (11th Cir. 1994) (per curiam) ("Under § 106(c) of the

Act, 8 U.S.C. § 1105a(c), a court lacks jurisdiction to consider a claim which has

not first been presented to the Board, as an alien must exhaust the administrative

remedies available to him prior to obtaining judicial review."); Ka Fung Chan v.

INS, 634 F.2d 248, 258 (5th Cir. 1981).   Moreover, an alien may not contest a

designation on appeal which he invited and acquiesced in below.  Accordingly, we

reject the Al Najjars' contentions that the UAE and Saudi Arabia were improperly

designated as their "last habitual residence" and affirm the IJ's designations.

As for the IJ's designation of Saudi Arabia and the UAE as the appropriate

countries of removal under § 1253(a),[24] we likewise affirm.  Section 1253

"authorize[d] the Attorney General to specify the country to which the alien will be

---

[24] This provision designates the countries to which an alien may be deported, giving each alien the right initially to designate the deportation country, and if "the country designated by the alien fails . . . [the] deportation of such alien shall be directed to any country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory.  If the government of such country fails finally to advise the Attorney General or the alien within three months following the date of original inquiry, or within such other period as the Attorney General shall deem reasonable . . . then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving any priority or preference because of their order as herein set forth either -- (1) to the country from which such alien last entered the United States; (2) to the country in which is located the foreign port at which such alien embarked for the United States or for foreign contiguous territory; (3) to the country in which he was born; (4) to the country in which the place of his birth is situated at the time he is ordered deported; (5) to any country in which he resided prior to entering the country from which he entered the United States; (6) to the country which had sovereignty over the birthplace of the alien at the time of his birth; or (7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory."  8 U.S.C. § 1253(a).

sent," once the alien's designation fails or the alien refuses to designate such a country.  Ademi v. INS, 31 F.3d 517, 520 (7th Cir. 1994).  The Attorney General's discretion under § 1253(a), which has been delegated to the Board, see 8 C.F.R. §3.1(d), is to be aided by seven statutory guidelines, see 8 U.S.C. § 1253(a).

While § 1253(a) gives the alien the power initially to designate the deportation country, when that designation fails or the alien refuses to specify such a country, the provision reposes very broad discretion in the Board to designate the removal country.  See Ademi, 31 F.3d at 520-21.  Here, the Al Najjars did not exercise their right to designate the country of deportation initially, so the immigration courts made this designation for them under § 1253(a). This procedure was mandated by § 1253(a), and we find no error here.

The Al Najjars' contentions that "statelessness" somehow alters the removal country designation are without merit.  Instead, § 1253(a) clearly defines the procedure to be followed in all cases, without reference to statelessness.  Where, for any reason, the alien refuses to designate the removal country, the designation is committed to the Board to be determined in accordance with seven statutory guidelines.  See 8 U.S.C. § 1253(a).  We find that there was no abuse of discretion in designating the UAE and Saudi Arabia as the removal countries; there is substantial evidence in the record as a whole demonstrating Fedaa's and Mazen's

60

nexus to these countries. Accordingly, we reject the Al Najjars' argument that the removal countries were improvidently designated under § 1253(a).

For the first time at oral argument, the Al Najjars cited Kuhai v. INS, 199 F.3d 909 (7th Cir. 1999), Andriasian v. INS, 180 F.3d 1033 (9th Cir. 1999), and Kossov v. INS, 132 F.3d 405 (7th Cir. 1998), to support their contention that the IJ improperly designated the asylum and deportation testing countries. In Kuhai, Kossov, and Andriasian, the immigration courts did not give the aliens adequate notice of the designated removal country and, as a result, the applicants were deprived of an opportunity to offer statutorily required, country-specific evidence necessary to establish eligibility for relief under the INA. See Kuhai, 199 F.3d at 912-14 ("Despite the fact that neither party briefed the issue, the Board [sua sponte] modified the order of the immigration judge to change Kuhai's country of deportation from Uzbekistan to Ukraine."); Andriasian, 180 F.3d at 1041 (reversing, as violative of due process, the BIA's affirmance of the IJ's decision to adopt, after the close of all evidence, an additional country of deportation); Kossov, 132 F.3d at 407-08 (reversing, as violative of due process, a husband and wife's consolidated deportation proceedings because "both the hearing before the IJ and BIA's review concentrated almost exclusively on Latvia . . . [y]et the order itself deports the Kossovs to Russia, not Latvia."). Kuhai, Kossov, and Andriasian

61

address immigration proceedings that do not afford adequate notice regarding changes in the country of deportation. Inadequate notice might raise due process concerns by depriving an alien of his or her opportunity to mount a case for relief insofar as asylum and withholding require an alien to establish the necessary country-specific showings. See 8 U.S.C. § 1101(a)(42)(A) (requiring proof of a "well-founded fear of persecution" on account of a statutorily protected factor in the country of the alien's nationality or "last habitual residence"); 8 U.S.C. §1253(a) (requiring that an alien demonstrate to the satisfaction of the Attorney General that his or her "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion").

In the instant appeal, the Al Najjars were not denied the opportunity to contest the proposed country of deportation or "last habitual residence" designations. To the contrary, there was ample notice and opportunity to adduce evidence. Thus, unlike Kuhai, Kossov, and Andriasian, the Al Najjars' proceedings involved no lack of notice that the UAE and Saudi Arabia, respectively, were the

appropriate petition-testing countries. Accordingly, the Al Najjars' cases involve no such due process concerns.[25]

### G. Suspension of Deportation

Fedaa argues that the BIA erred in denying her request for suspension of deportation on the ground that she failed to demonstrate extreme hardship. Mazen argues that the BIA erred in concluding that he failed to demonstrate the continuous physical presence element of his suspension claim.

Section § 244(a)(1) of the INA, 8 U.S.C. § 1254(a)(1), which was repealed by IIRIRA § 308(b)(7),[26] governs Fedaa's and Mazen's suspension applications. In order to be eligible for suspension of deportation under § 244(a)(1) of the Act, an applicant must establish that: (1) he or she "has been physically present in the United States for a continuous period of not less than seven years immediately

---

[25] Before the IJ, Mazen's attorney conceded that the UAE was Mazen's "last habitual residence." See A.R. at 1286. And, as to Fedaa, there is no doubt that Saudi Arabia is the proper asylum and deportation-testing country because, other than her decade hiatus in Florida, Fedaa has not resided anywhere in the world except Saudi Arabia, and her entire family still lives there. The Al Najjars' strategy before the IJ and BIA was to insist that they were stateless Palestinians; however, as noted above, statelessness does not obviate the necessity of designating a country of deportation or "last habitual residence." Thus, to the extent the Al Najjars conceded and/or did not contest these country designations below, they will not be permitted to raise this argument for the first time on appeal. See 8 U.S.C. § 1105a(c) (repealed); Asencio, 37 F.3d at 615-16; Ka Fung Chan, 634 F.2d at 258.

[26] The new version is INA § 240A, 8 U.S.C. § 1229b, under which "suspension of deportation" is now referred to as "cancellation of removal." See IIRIRA § 304(a) (placing suspension relief in INA § 240A).

preceding the date of such application;" (2) "during all of such period he was and is a person of good moral character;" and (3) he or she "is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. §1254(a)(1). Even if an alien establishes statutory eligibility for suspension under INA § 244, the Attorney General possesses the "unfettered discretion" to deny such an application. See INS v. Yueh- Shaio Yang, 519 U.S. 26, 30, 117 S. Ct. 350, 352 (1996) ("We have described the Attorney General's suspension of deportation under a related and similarly phrased provision of the INA as 'an act of grace' which is accorded pursuant to her 'unfettered discretion'") (quoting Jay v. Boyd, 351 U.S. 345, 354, 76 S. Ct. 919, 925 (1956)); Tefel v. Reno, 180 F.3d 1286, 1301 (11th Cir. 1999) ("the Attorney General possesses broad discretion in awarding suspension of deportation"), cert. denied, 530 U.S. 1228, 120 S. Ct. 2657 (2000). The applicant for suspension bears the burden of demonstrating both statutory eligibility and that the equities merit a favorable exercise of discretion. See 8 C.F.R. 240.64(a) (2001).

The BIA affirmed the IJ's denial of suspension to Fedaa, finding that she failed to demonstrate the necessary element of extreme hardship. In Mazen's case,

64

the BIA affirmed the IJ's pretermittance of his suspension application on the ground that Mazen could not establish "continuous physical presence." The Al Najjars ask us to review these decisions, but before doing so, we must inquire into our jurisdiction.

IIRIRA commands that in the case of a transitional alien "there shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(j), 244, or 245 of the Immigration and Nationality Act." IIRIRA § 309(c)(4)(E), reprinted in 8 U.S.C. § 1101 (history) (1999). Section 309(c)(4)(E) does not preclude our review of all decisions under § 244 of the INA, but applies only to "any discretionary decision" under the enumerated provisions. Thus, the question is whether determinations as to "extreme hardship" and "continuous physical presence" constitute "discretionary decision[s]" within the meaning of IIRIRA §309(c)(4)(E). These are questions of first impression in this Circuit.

As to the "extreme hardship" prong, the Supreme Court has made it clear that the "Attorney General and his delegates have the authority to construe 'extreme hardship' narrowly should they deem it wise to do so." INS v. Jong Ha Wang, 450 U.S. 139, 145, 101 S. Ct. 1027, 1031 (1981) (per curiam); see also INS v. Phinpathya, 464 U.S. 183, 195, 104 S. Ct. 584, 592 (1984) ("In INS v. Wang, we rejected a relaxed standard for evaluating the 'extreme hardship' requirement as

impermissibly shifting discretionary authority from INS to the courts."). This indicates that the Court views this element as discretionary. Before IIRIRA, we likewise viewed the "extreme hardship" element as discretionary insofar as we consistently reviewed such determinations for abuse of discretion only -- instead of employing a substantial evidence test. See, e.g., Prado-Gonzalez v. INS, 75 F.3d 631, 632 n.1 (11th Cir. 1996) (per curiam); Gomez-Gomez v. INS, 681 F.2d 1347, 1349 (11th Cir. 1982); Aguilar v. INS, 638 F.2d 717, 719 (5th Cir. 1981) (per curiam).

All of the Circuits that have examined this issue have concluded that the determination of "extreme hardship" under INA § 244 is a discretionary decision that the transitional rules insulate from direct judicial review. See, e.g., Escalera v. INS, 222 F.3d 753, 755-56 (10th Cir. 2000) (concluding that IIRIRA § 309(c)(4)(E) divests the court of appeals of jurisdiction to review a determination that the alien failed to demonstrate "extreme hardship"); Bernal-Vallejo v. INS, 195 F.3d 56, 63 (1st Cir. 1999) ("'extreme hardship' determination is a discretionary decision barred from judicial review by § 309(c)(4)(E)"); Moosa v. INS, 171 F.3d 994, 1012-13 (5th Cir.1999) ("denials of suspension based on the INS § 244 element of 'extreme hardship' are discretionary decisions, which IIRIRA § 309(c) precludes us from reviewing"); Kalaw v. INS, 133 F.3d 1147, 1152 (9th

Cir. 1997) ("the transitional rules operate to remove direct judicial review of BIA determinations of 'extreme hardship'").  In light of our existing precedent and the sound reasoning of our sister Circuits, we likewise conclude that in transitional cases, "extreme hardship" under INA § 244 is a discretionary decision that IIRIRA § 309(c)(4)(E) bars from judicial review.  Accordingly, we have no jurisdiction to review the BIA's determination that Fedaa failed to demonstrate "extreme hardship" and decline her request to review the denial of her suspension claim on this ground.

Turning now to the "continuous physical presence" requirement on which the BIA affirmed the denial of Mazen's suspension application, we inquire into whether this was also a "discretionary decision" within the meaning of §309(c)(4)(E).  In Kalaw v. INS, 133 F.3d 1147, 1151 (9th Cir. 1997), the Ninth Circuit examined this question, reasoning that:

> [C]ontinuous physical presence[ ] must be determined from the facts, not through an exercise of discretion. Either the petitioner has been continuously present in the United States for seven years or the petitioner has not. There are legal standards guiding this inquiry, see, e.g., Rosenberg v. Fleuti, 374 U.S. 449, 462, 83 S. Ct. 1804, 1812, 10 L. Ed.2d 1000 (1963) (brief, casual, and innocent departures from the United States do not break a period of continuous physical presence), and we have reversed the BIA's determination when it applied the wrong standard, see, e.g., Castrejon-Garcia v. INS,60 F.3d 1359 (9th Cir.1995); Kamheangpatiyooth v. INS, 597 F.2d 1253 (9th Cir.1979). . . . Thus, the transitional rules of judicial review provided in IIRIRA

67

§§ 309(c)(4)(E) . . . do not remove appellate jurisdiction over an alien's challenge to the BIA's denial of an application for suspension of deportation solely on this ground.

Similarly, in Bernal-Vallejo, the First Circuit found that "the determination of whether the seven year continuous presence requirement has been met is subject to legal standards that guide the inquiry" and is thus, "non-discretionary" within the meaning of § 309(c)(4)(E). 195 F.3d at 62. As Kalaw and Bernal-Vallejo demonstrate, the determination of continuous physical presence is not subject to the agency's discretion, but is a matter of applying the law to the facts of the case. See also Gonzalez-Torres v. INS, 213 F.3d 899, 901 (5th Cir. 2000) (interpreting the continuous physical presence requirement and the new stop-time provisions of IIRIRA not as "matter[s] of agency discretion, but involv[ing] application of the law to factual determinations"). Accordingly, the "continuous physical presence" element of INA § 244 is not a "discretionary decision" under IIRIRA § 309(c)(4)(E), and we may review the BIA's denial of Mazen's suspension application on this ground.

The BIA reasoned that Mazen's suspension petition was properly pretermitted by the IJ because Mazen failed to establish the required seven years of continuous physical presence. The BIA found that Mazen entered the United States on December 8, 1984, and an OSC was issued against him on April 19,

1985. Because an alien's physical presence clock stops when he is served with an OSC, the Board concluded that Mazen was ineligible to apply for suspension for failure to establish the requisite seven years.

We agree with the BIA. Before IIRIRA, the time an alien spent in deportation proceedings counted toward the physical presence requirement. However, IIRIRA enacted a "stop time" provision providing that the period of continuous physical presence would be deemed to end once the alien was served with a notice to appear for removal proceedings or at which time the alien committed a criminal offense described in INA § 244A(d)(1). See IIRIRA §305(c)(5); Tefel, 180 F.3d at 1289 (citing 8 U.S.C. § 1229b(d)(1)). Subsequently, Congress promulgated the Nicaraguan and Central American Relief Act, see Pub. L. 105-100, 111 Stat. 2160 (1997) ("NACARA"), which, among other things, amended IIRIRA § 309(c)(5) to broaden the phrase "notices to appear" to encompass "orders to show cause" as well, see NACARA § 203(f), and specifically to make NACARA's amendments effective as if originally enacted with IIRIRA.[27]

_____

[27] INA § 240A(d)(1), 8 U.S.C. § 1229b(d)(1) (2000) provides that:

> [A]ny period of continuous physical residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear . . . or when the alien has committed an offense referred to in section 1182(a)(2) of this title . . .

And, IIRIRA § 305(c)(5), as amended by NACARA § 203(f), provides that:

See Tefel, 180 F.3d at 1293.  In Tefel v. Reno, 180 F.3d 1286, 1293 (11th Cir. 1999), cert. denied., 530 U.S. 1228, 120 S. Ct. 2657 (2000), we interpreted IIRIRA § 305(c)(5), as amended by NACARA § 203, to mean that the continuous physical presence clock starts upon the issuance of a "notice to appear" or an "order to show cause" and, thus, "the stop-time provision applies to aliens who were facing deportation and/or had applied for suspension of deportation before IIRIRA's enactment."

Under the reasoning of Tefel, Mazen's physical presence clock stopped when he was served with an order to show cause in April 1985 upon the commencement of his removal proceedings.  See id.  We agree with the BIA that Mazen has proved continuous physical presence only from December 5, 1984, to April 1985, and therefore, that he has failed to establish an essential element of his suspension claim.

When recalendaring Mazen's deportation proceedings in 1996, the INS issued a Form I-261 to supplement the factual allegations contained in the 1985 OSC.  Accordingly, the instant deportation proceedings stem from the 1985 OSC

---

Subject to subparagraphs (B) and (C), paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act [section 1229b(d) of this title] (relating to continuous physical presence) shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act.

70

and were merely supplemented with additional allegations in 1996. To the extent that Mazen argues that his stop-time clock was merely suspended and restarted in June 1986 when the 1985 deportation proceedings were administratively closed, we reject his argument.

In In re Mendoza-Sandino, Int. Dec. 3426, 2000 WL 225840 (BIA 2000), a majority of the en banc BIA interpreted INA 240A(d)(1), 8 U.S.C. § 1229b(d)(1), to mean "that the continuous physical presence clock does not start anew after the service of an Order to Show Cause." The Board based this interpretation on the statute's language, title and history. The BIA reasoned that while § 240A(d)(1) states that an alien's period of continuous physical presence in the United States "shall be deemed to end when the alien is served" with a charging document, subsection (d)(2) states that when an alien departs the United States for more than 90 days the alien "shall be deemed to have failed to maintain continuous physical presence." See INA § 240A(d), 8 U.S.C. §1229b(d) (emphasis added). Mendoza found that use of the word "end" in subsection (d)(1) and "fail[ ] to maintain" in (d)(2) demonstrates Congress' intent to restart the seven-year clock upon certain events, such as an alien's reentry into the United States after an absence in excess of 90 days, but that Congress did not intend to restart the clock after the alien had been served with an OSC or notice or appear. Instead, the BIA found that "under

71

section 240A(d)(1), such service is deemed to end an alien's presence completely." Thus, "a reading of section 2450A(d)(1) that would allow an alien to accrue a new period of continuous physical presence after the service of a charging document is not supported by the language of either section 240A(d)(1) or (2)."

Where the BIA's interpretation of the INA is reasonable and consistent with the plain language of the statute, we are obliged to defer to the Board's interpretation. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424, 119 S. Ct. 1439, 1445-46 (1999). After examining the statute, the BIA opinion, and the well-reasoned decisions of our sister Circuits on this issue, we too find that Mendoza is reasonable and consistent with the statute's language and legislative history and we therefore defer to the BIA's interpretation of § 240A(d)(1) to reject Mazen's claim. Accord McBride v. INS, 238 F.3d 371, 374-77 (5th Cir. 2001); Afolayan v. INS, 219 F.3d 784, 788-89 (8th Cir. 2000). See also Ram v. INS, 243 F.3d 510, 518 (9th Cir. 2001) ("hold[ing] that an alien does not begin a new period of continuous physical presence after being served with an OSC").

## H.  **Motions to Remand**

Lastly, the Al Najjars argue that the BIA committed reversible error in denying their motions to remand.  The Al Najjars submitted two such motions to the BIA, and both were denied.

First, on November 7, 1996, the Al Najjars filed a "Motion to Remand Case to Immigration Judge," arguing that a new hearing was warranted because the IJ erred in pretermitting Mazen's application for suspension of deportation.  In the motion, the Al Najjars argued that the IJ's legal error in applying Matter of N-J-B-, 21 I&N Dec. 812 (BIA  1997), tainted not only the IJ's consideration of Mazen's suspension, asylum, and withholding claims, but also Fedaa's similar claims.  Thus, the Al Najjars requested that their consolidated proceedings be remanded to the IJ for a new hearing.  The BIA denied this motion, stating that "given our disposition of this appeal, the respondent's November 7, 1997, motion to remand the instant case, for a hearing on the relief of suspension of deportation, is denied."  Because we affirm the BIA's decision to deny Mazen's suspension application, see supra at II., G., we likewise affirm the BIA's denial of the motion to remand on this ground.

On June 19, 1999, the Al Najjars submitted a second motion to remand.  This motion requested the BIA to remand so that the IJ could consider the Al

Najjars' claims under Article 3 of the United Nations Convention Against Torture

and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT" or "the

Convention"), June 26, 1987, S. Treaty Doc. No. 100-200 (1988), 1465 U.N.T.S.

85, which is implemented through the Foreign Affairs Reform and Restructuring

Act ("FARR"), Pub. L. No. 105-277,112 Stat. 2681, 2681-821 (1999). The BIA

denied this motion as well, reasoning that because the Al Najjars failed to meet the

prima facie standard for asylum, they could not demonstrate eligibility for relief

under CAT.

Under 8 C.F.R. § 3.1(d) (1999), the "Board may return a case to the Service

or Immigration Judge for such further action as may be appropriate, without

entering a final decision on the merits of the case." While § 3.1(d) authorizes the

BIA to order a remand, courts generally look at the substance of such a motion to

determine how it should be scrutinized on appeal. If a motion to remand "simply

articulates the remedy requested by an appeal, [it is] treat[ed ] as part of the

appeal" and not as a motion to reopen or reconsider. Matter of Coelho, 20 I&N

Dec. 464, 471 (BIA 1992). Conversely, if a motion to remand seeks to introduce

evidence that has not previously been presented, it is generally treated as a motion

to reopen under 8 C.F.R. § 3.2(c). See id.; see also Saiyid v. INS, 132 F.3d 1380,

1383 n. 3 (11th Cir. 1998) ("Courts customarily treat motions to remand as motions

74

to reopen under 8 C.F.R. § 3.2"); <u>Mansour v. INS</u>, 230 F.3d 902, 907 n.2 (7th Cir. 2000) (Because the alien's "request was 'essentially a motion to reopen proceedings to present additional evidence and apply for new relief,'" the court "analyze[d] his request as a motion to reopen."); <u>Lara v. Trominski</u>, 216 F.3d 487, 499 n.13 (5th Cir. 2000) (same); <u>Varela v. INS</u>, 204 F.3d 1237, 1239 n. 4 (9th Cir. 2000) ("A motion to reopen is the correct motion to file when seeking to present new facts not already in evidence."). Where the motion is treated as one to reopen, the pleading should be subjected to the substantive requirements for such a motion. <u>See</u> <u>Matter of Coelho</u>, <u>supra</u>, at 471.

In this instance, the Al Najjars' motion to remand under CAT is in the nature of a motion to reopen because the Al Najjars requested additional proceedings to present new evidence regarding their eligibility for relief under CAT. Accordingly, we will analyze it as such on appeal.[28] <u>See</u> <u>Mansour</u>, 230 F.3d at 907 n.2; <u>Saiyid</u>, 132 F.3d at 1383 n.3; <u>Varela</u>, 204 F.3d at 1239 n.4; <u>Lara</u>, 216 F.3d at 499 n.13.

### 1. Judicial Review of a Motion to Reopen

---

[28]This determination is not intended in any way to affect § 3.2(c)(2)'s limitation that "a party may file only one motion to reopen deportation" proceedings, as our determination that the CAT motion was in the nature of a motion to reopen is merely for purposes of appellate review.

The authority for motions to reopen "derives solely from regulations promulgated by the Attorney General." INS v. Doherty, 502 U.S. 314, 322, 112 S.Ct. 719, 724 (1992). Under 8 C.F.R. § 3.2(c), the Attorney General has commanded that a "motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." The provision is "framed negatively," by "direct[ing] the Board not to reopen unless certain showings are made. It does not affirmatively require the Board to reopen the proceedings under any particular condition. Thus, the regulations may be construed to provide the Board with discretion in determining under what circumstances proceedings should be reopened." INS v. Abudu, 485 U.S. 94, 105, 108 S. Ct. 904, 912 (1988) (quoting Jong Ha Wang, 450 U.S. at 144 n.5, 101 S. Ct. at 1031 n.5). Indeed, under the applicable regulations, "the Attorney General has 'broad discretion' to grant or deny such motions." Doherty, 502 U.S. at 323, 112 S. Ct. at 724. As such, we employ a very deferential abuse of discretion standard in reviewing the BIA's decision on a motion to reopen "regardless of the underlying basis of the alien's request" for relief. Id., 112 S. Ct. at 725; see also Mansour, 230 F.3d at 906-07 ("review[ing] the BIA's decision not to reopen the case under the C[AT] . . for abuse of discretion").

At a minimum, there are at least three independent grounds upon which the Board may deny a motion to reopen: 1) failure to establish a prima facie case; 2) failure to introduce evidence that was material and previously unavailable; and 3) a determination that despite the alien's statutory eligibility for relief, he or she is not entitled to a favorable exercise of discretion. See Doherty, 502 U.S. at 323, 112 S. Ct. at 725 (citing Abudu, 485 U.S. at 104-105, 108 S. Ct. at 911-12).

Here, the BIA denied the motion on the ground that the Al Najjars failed to demonstrate a prima facie case for protection under CAT. The BIA found that, because the Al Najjars failed to demonstrate a "well-founded fear of persecution" sufficient to support an asylum claim, they could not satisfy the "heavy burden" of demonstrating CAT eligibility.

### 2. Heavy Burden

First, the Al Najjars argue that the BIA improperly employed a "heavy burden" standard of review which merits reversal. We disagree.

In utilizing a "heavy burden," the BIA cited INS. v. Abudu, 485 U.S. 92, 110, 108 S. Ct. 904, 914 (1988). In Abudu, the Supreme Court analogized the burden on an applicant seeking to reopen to that imposed on a criminal defendant seeking a new trial "on the basis of newly discovered evidence, as to which courts

have uniformly held that the moving party bears a heavy burden." Id. at 110, 108 S. Ct. at 914. The implication of this analogy, the reasoning of Abudu, and the fact that the regulations "plainly disfavor" motions to reopen all support the BIA's imposition of a "heavy burden." See id.; see also Matter of Coelho, supra, at 471-72 (explaining that "a party seeking reopening bears a 'heavy burden'").

The Al Najjars contend that 8 C.F.R. § 208.18(b)(2) (2001), which governs motions to reopen under CAT, articulates a much more deferential standard than the "heavy burden" and, therefore, the BIA erred in deciding their motion.[29] The Al Najjars' interpretation of § 208.18(b)(2), as abrogating the heavy burden articulated in Abudu and Matter of Coelho, is unpersuasive. They point to nothing

---

[29] 8 C.F.R. § 208.18(b)(2) states:

An alien under a final order of deportation, exclusion, or removal that became final prior to March 22, 1999 may move to reopen proceedings for the sole purpose of seeking protection under § 208.16(c). Such motions to reopen shall be governed by [8 C.F.R.] §§ 3.23 and 3.2 of this chapter, except that the time and numerical limitations on motions to reopen shall not apply and the alien shall not be required to demonstrate that the evidence sought was unavailable and could not have been presented at the former hearing. The motion to reopen shall not be granted unless:

(i) The motion is filed within June 21, 1999; and

(ii) The evidence sought to be offered establishes a prima facie case that the applicant's removal must be withheld or deferred under §§ 208.16(c) or 208.17(a).

in § 208.18(b)(2) which alters this burden of proof. Accordingly, we reject the Al Najjars' contention and affirm the imposition of a "heavy burden."

### 3. Prima Facie CAT Claim

Next, the Al Najjars argue that it was error for the BIA to reject their motion to remand because the new evidence of imputed terrorist opinions was compelling and merited a remand. The BIA held that because the Al Najjars failed to demonstrate asylum eligibility, they likewise could not satisfy the standard for CAT eligibility. We agree.

Under § 3.2(c), the Board is required to consider the factual assertions and supporting evidentiary submissions in determining the merit of a motion to reopen. See 8 C.F.R. § 3.2(c) (2001). Here, the record on appeal reveals that in their motion to remand under CAT, the Al Najjars merely claimed that there were "substantial grounds for believing [they] would be in danger of being subjected to torture" in the UAE and Saudi Arabia on account of terrorist opinions imputed after the IJ's decision. For instance, the motion states that "the . . . governments [of Israel, Saudi Arabia, UAE, and Egypt] have policies regarding terrorism which would make them take the Al-Najjars into detention." Yet, the motion does not provide any proof of what these policies are. Without explanation as to why they will be imprisoned, the motion then asserts that a non-record, 1997 DOS Report on

79

human rights proves that prisoners in the UAE and Saudi Arabia are abused by governmental officials. However, since the Al Najjars failed to submit the 1997 Country Report which allegedly supports these assertions, the material never became part of the administrative record, and we are therefore barred from considering it on appeal. See 8 U.S.C. § 1105a(a)(4); IIRIRA § 309(c)(4)(B). Based on the fact that the Al Najjars failed to submit evidence to support their motion, the BIA properly considered only the factual record before it in assessing its merit. This is the vantage point from which we review the Board's decision.

In making out a claim under the CAT, "[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (2001). In turn, "torture" is defined as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1) (2001). Relief under the Convention is in the form of the mandatory remedy of withholding of removal. See 8 C.F.R. § 208.16(c).

There is no reason to disturb the BIA's conclusion that, because the Al Najjars failed to demonstrate a "well-founded fear of persecution" sufficient to support an asylum claim, they likewise cannot establish "torture" sufficient to warrant relief under CAT. The burden of proof for an applicant seeking withholding of removal under the Convention, like that for an applicant seeking withholding of removal under the statute, is higher than the burden imposed on an asylum applicant. See 8 C.F.R. § 208.16(c)(2). On the record before the BIA, there was no evidence of a well-founded fear, and it therefore follows that the Al Najjars failed to demonstrate that it was more likely than not that they would be tortured on account of a protected factor.[30] Accordingly, we affirm the BIA's denial of the motion to remand under CAT as supported by substantial evidence, and well within the broad discretion of the BIA in determining a motion to reopen.

### III. CONCLUSION

While the Al Najjars raise serious concerns on appeal, none is substantiated with record evidence. This stems from the fact that such evidence either does not exist, or their attorneys failed to offer it. In either case, we cannot expand the scope of our review where an alien fails to follow immigration procedures. Based

---

[30] The Al Najjars failed to offer the BIA any supplemental or additional evidence demonstrating their eligibility for relief under CAT. Instead, through motions to supplement and take judicial notice, they seek to have us examine evidence in the first instance in the court of appeals. We are prohibited from this endeavor. See IIRIRA § 309(c)(4)(B); 8 U.S.C. §1105a(a)(4).

on the record before us, we find the BIA's denial of asylum, suspension, and

withholding to be supported by substantial evidence.  We also affirm the BIA's

denial of the motion to remand under the Convention Against Torture.  For all of

the foregoing reasons, the BIA's decisions are affirmed and the Al Najjars'

PETITIONS FOR REVIEW ARE DENIED.[31]

---

[31] Any pending motion not disposed of explicitly in this opinion is denied.